[No. A123480. First Dist., Div. Five. Jan. 25, 2011.]

WILSON & WILSON, Plaintiff and Respondent, v.
CITY COUNCIL OF REDWOOD CITY et al., Defendants and Appellants.

---

Counsel

Kerr & Wagstaffe, James M. Wagstaffe, Maria Radwick; McDonough Holland & Allen, Iris P. Yang, Kara K. Ueda; and Stanly T. Yamamoto, City Attorney, for Defendants and Appellants.

John J. Hartford; Hannig Law Firm, John H. Blake; Wilson & Wilson and Donald A. Wilson for Plaintiff and Respondent.

---

## Opinion

**SIMONS, Acting P. J.**—In February 2003, the law firm of Wilson & Wilson (Wilson) brought an action against the City Council of Redwood City (City Council), the City of Redwood City (Redwood City), and the Redwood City Redevelopment Agency (Redevelopment Agency) (hereafter collectively the City) to challenge the approval and construction of a retail-cinema redevelopment project in Redwood City's downtown. Wilson asked the court to invalidate resolutions enacted by the City Council and the Redevelopment Agency and to void agreements entered into by the City to carry out the redevelopment. The action did not come to trial until 2004, and final arguments were not held until 2007, by which time the retail-cinema project had been substantially completed. Although the City urged the trial court to dismiss the action as moot, the trial court found for Wilson and entered judgment against the City in 2008.

The City appeals from that judgment, arguing that the trial court should have dismissed Wilson's action because it did not present a justiciable controversy. We agree that Wilson's action was not justiciable, and we reverse the judgment and instruct the trial court to dismiss Wilson's action.

### FACTUAL AND PROCEDURAL BACKGROUND

#### *The Original Redevelopment Project*

In 1982, the City adopted a redevelopment plan to combat the economic stagnation of its downtown area. Initially, the City planned to redevelop two downtown blocks into a retail-cinema, office, and parking project. "Block 1," bounded by Middlefield Road, Broadway Street, and Jefferson Avenue, was to be the site of a retail-cinema development containing ground floor retail and restaurant space and a 20-screen, 4,200-seat movie theatre on the second floor. The area designated "Block 2" is located across Middlefield Road from Block 1 and is bounded by Winslow Street, Middlefield Road, Jefferson

Avenue, and the Caltrain railroad tracks. Under the City's original plan, Block 2 would have been developed with a 108,400-square-foot office building and public parking garage.

To implement the original plan, the City entered into a disposition and development agreement (DDA) with Western Innisfree Ventures, LLC (the Developer), on January 29, 2001.[1] The following day, the City issued a notice of determination under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) certifying the environmental impact report (EIR) for the original project. (See Pub. Resources Code, § 21152, subd. (a).) Wilson, which owns property located on Block 2 that would have been directly affected by the original project, did not challenge the EIR.

Due to a decline in the market for office space following approval of the original project, it became impracticable to construct the office building that had been planned for Block 2. The City and the Developer therefore agreed to eliminate the office-parking structure previously planned for that block and instead to construct the retail-cinema component above a two-level underground parking garage on Block 1. As modified, the new project consisted of approximately 85,000 square feet of ground floor retail and restaurant space, the movie theatre, and an underground parking garage with some 590 spaces (the Project).

### The Amended Disposition and Development Agreement

On January 8, 2003, the City and the Developer entered into an amended and restated DDA (the ADDA), which superseded the DDA. The ADDA provided that the Developer would pay $7.5 million for acquisition of the air rights parcel needed to construct the retail-cinema portion of the Project, with the City contributing the remaining cost of site acquisition.

The ADDA included a number of provisions concerning parking. In addition to the underground parking spaces located beneath the retail-cinema building, the City contemplated creating approximately 300 offsite parking spaces, with as many as possible on Block 2. To that end, the City agreed that it would "use its best efforts and legally available means to provide additional parking as more particularly described in the Parking Facilities Agreement." The terms of the latter agreement were to be negotiated later in accordance with the "Retail/Cinema Parking Business Points" document (the Business Points) incorporated as attachment 7 to the ADDA. The Business Points declared that "[t]he purpose of the final Parking Facility Agreement is to

---

[1] Western Innisfree Ventures, LLC, was later renamed BHV Innisfree Ventures I, LLC. It was not a party to the action below and is not a party to this appeal.

ensure that sufficient parking is available in the downtown . . . ." The parties agreed, however, that "the Parking Agreement is one, but certainly not the only tool for assuming this common goal." By their terms, the Business Points were nonbinding, and stated in their first paragraph that "execution of this document will not bind or obligate the signatories until all the signatories execute the final Parking Facilities Agreement."

Regarding the Block 2 parking lot, the Business Points, echoing the language of the ADDA itself, stated, the "City will use its best efforts and legally available means to acquire the remaining parcels and, if the acquisition is successful, will restripe it to create a total of approximately 300 parking spaces." (Fns. omitted.) A footnote to the foregoing sentence cautioned that the "City cannot, however, commit to making the acquisition before a legally required eminent domain public hearing is held." Another footnote explained that the number of spaces might vary by plus or minus 10 percent, depending upon the City's determination of the number of spaces that could fit on the site.

### Planning and Approval of the Project

In November 2002, the City and its environmental consultant completed an addendum to the original EIR (the EIR Addendum). The EIR Addendum found that the changes made from the original redevelopment project, including the elimination of the office building on Block 2, made the Project smaller in scale than the project evaluated in the previously certified EIR. The City concluded that an EIR Addendum was the required CEQA compliance document for the Project because the scope of the Project had narrowed, and the changes tended to reduce the severity of previously identified environmental impacts.

On November 23 and 30, 2002, a notice was published in the Redwood City Tribune announcing that the City Council and the Redevelopment Agency would hold a joint public hearing on December 9, 2002, to review both the ADDA and a revised summary report for the Project. (See Health & Saf. Code, § 33433, subd. (a)(1) & (2).) The City also made the ADDA, the summary report, and the EIR Addendum available for public review. The City sent between 550 and 600 official meeting notices to owners and tenants in the downtown area. Both the notice published in the Redwood City Tribune and the notices sent to downtown area owners and tenants stated that the joint public hearing would be held on December 9, 2002. In addition, the City sent 51 courtesy notices to individuals who had spoken at prior public meetings, whether or not they resided in the vicinity of the Project. The courtesy notices stated that public hearings would be held on December 9 and December 16, 2002. Wilson's principal, Donald Wilson, received the notice specifying only

the December 9 hearing date and did not receive one of the 51 courtesy notices that included a second hearing date. He later testified that he "was aware of the two meetings by the time of the hearing on [December 9]."

The City Council and the Redevelopment Agency held a joint public hearing on December 9, 2002, to consider approving the EIR Addendum, approving the summary report, and authorizing execution of the ADDA. According to the minutes of the meeting, several members of the public spoke, including Donald Wilson. The minutes reflect that he urged the City Council to consider whether it should "endorse the expenditure of $26 million . . . to fund a parking structure primarily for the exclusive use of the theatre project." Neither Donald Wilson nor any other speaker raised any environmental issues, and Wilson made no objections concerning the EIR Addendum. He also submitted nothing in writing at the December 9 hearing.

After hearing the comments from the public, members of the City Council responded to the issues that had been raised. At the conclusion of the hearing, the City Council and the Redevelopment Agency adopted resolutions approving the ADDA, the EIR Addendum, and the summary report (the Resolutions).

On February 24, 2003, the City Council and the Redevelopment Agency held a joint meeting at which they agreed to authorize Redwood City, rather than the Redevelopment Agency, to acquire the properties on Block 1 by eminent domain.[2] The City Council and the Redevelopment Agency therefore approved the first implementation agreement to the ADDA. In adopting this agreement, the parties "determined that [Redwood] City, rather than the [Redevelopment] Agency should be responsible for acquiring the Acquisition Parcels, as defined in the [ADDA]."

*Wilson's Action*

Meanwhile, on February 7, 2003, Wilson had filed a complaint against the City. The original complaint contained three causes of action. It sought

---

[2] The City Council and the Redevelopment Agency took this action as a result of a legal challenge that had been filed by Wilson in 2001. Under an earlier version of the City's redevelopment plan, the City's eminent domain authority would have expired on January 18, 2002. In July 2001, the City adopted an amendment to its redevelopment plan that extended its eminent domain authority by six years. In September of that year, Wilson filed a petition for writ of mandate and complaint for declaratory relief seeking to invalidate the plan amendment. Rather than delay the acquisition process, the city attorney recommended that Redwood City and the Redevelopment Agency enter into an agreement that would authorize Redwood City to conduct the acquisition. In March 2005, Wilson obtained a favorable ruling from the trial court, which invalidated the plan amendment. In an unpublished opinion, we reversed the trial court's decision. (*Wilson & Wilson v. City Council of Redwood City* (July 12, 2006, A110341) [nonpub. opn.].)

invalidation of the ADDA, a writ of mandate, and declaratory relief. On February 26, 2003, Wilson filed a first amended complaint (FAC), which is the operative pleading in this case. The action was brought as a "reverse validation action."[3] The FAC abandoned the writ of mandate cause of action, but like Wilson's original complaint, the FAC's first cause of action sought to have the court invalidate the ADDA on various grounds. The second cause of action requested declaratory relief.

For the most part the FAC challenged the Project as too costly to the taxpayers and improperly beneficial to the Developer. The FAC also attacked the Resolutions on certain procedural grounds. Among other things, the FAC claimed the ADDA should be invalidated because the Project had been substantially modified after its initial conception, and therefore a new EIR should have been prepared rather than an EIR Addendum. It also claimed the Resolutions were not preceded by appropriate public input because the public meeting allegedly scheduled for December 16, 2002, had been cancelled and the members of the City Council and the Redevelopment Agency had "plainly predetermined" that the Project would be approved. Finally, Wilson asserted that its property was not required for the Project.

In its prayer for relief, Wilson asked the court to determine that the approvals of the EIR Addendum and the ADDA were "invalid, illegal, void and of no effect." It also requested that the court direct the City Council and the Redevelopment Agency to seek reimbursement "for all monies illegally and improperly spent on the Project." The FAC further asked for a declaration that the Resolutions were not "proper and lawful" and did not "authorize the actions therein stated." Finally, Wilson requested an award of attorney fees and costs.

### Proceedings Prior to Trial

Between the filing of the FAC and the scheduled date for commencement of trial, Wilson sought no discovery from the City. Although Wilson claimed in its mandatory settlement conference statement that it wanted to "[s]top the . . . Project until a new DDA is negotiated and the total cost is accurately known," at no time did Wilson ask the court for a stay or injunction to halt construction of the Project.

The City filed a motion for summary judgment in the action in August 2003. Among other arguments, the City contended that Wilson had failed to

---

[3] A "reverse validation action" is a suit brought under Code of Civil Procedure section 863 in which an interested person seeks a determination of the validity of some public agency action, such as an ordinance or resolution. (See *Bonander v. Town of Tiburon* (2009) 46 Cal.4th 646, 656 [94 Cal.Rptr.3d 403, 208 P.3d 146]; *Katz v. Campbell Union High School Dist.* (2006) 144 Cal.App.4th 1024, 1027–1028 [50 Cal.Rptr.3d 839], citing Code Civ. Proc., § 860.)

exhaust its administrative remedies with respect to the claimed CEQA violations and that Wilson's second cause of action for declaratory judgment did not present an "actual controversy" between the parties. (See Code Civ. Proc., § 1060.) The City claimed no actual controversy existed because Wilson's property "is not included within the . . . Project."

In its opposition to the City's motion, Wilson did not claim it had raised any CEQA issues at the December 9, 2002 public hearing, but asserted that an unidentified "local businessman" had raised concerns about the depth of the excavation.[4] The opposition did not directly address the City's contention that Wilson's second cause of action presented no actual controversy. It did note, however, that under the ADDA, "[Wilson's] block would be reserved for *future* development." (Italics added.)

The City's reply to Wilson's opposition pointed out the opposition raised issues regarding the City's eminent domain power that were not included in the pleadings. The City objected that Wilson had not sought leave to amend its complaint and contended that allowing Wilson to do so would result in unwarranted delay in resolving the validity of the City's actions.

The trial court denied the City's motion for summary judgment, and trial was then set to begin on April 26, 2004.

## The Trial

Trial in this matter consumed six days. The parties were unable to agree on the issues to be tried, and the City objected that many of the issues Wilson raised were outside the scope of the FAC. Over the City's objection, the trial court permitted Wilson to call several witnesses.[5]

Wilson examined a number of City officials who testified that construction of the Project was proceeding during the trial, a fact acknowledged by both Donald Wilson and Wilson's counsel. Indeed, during his testimony, Donald Wilson acknowledged that one of the parking structures had already been built. In fact, during the course of the trial, Wilson requested that the court

---

[4] The minutes of the December 9, 2002 public hearing reflect no such presentation. (See *Le Strange v. City of Berkeley* (1962) 210 Cal.App.2d 313, 327 [26 Cal.Rptr. 550] [official minutes of board meeting are prima facie evidence of facts stated therein]; see also Evid. Code, § 1280.)

[5] The City argued that the decision in a reverse validation action must be based solely on the administrative record. (See, e.g., *Poway Royal Mobilehome Owners Assn. v. City of Poway* (2007) 149 Cal.App.4th 1460, 1479 [58 Cal.Rptr.3d 153] [in validation action, " '[t]he trial court reviews the decision-making process of the administrative agency and does not conduct its own evidentiary hearing' "].)

take judicial notice of the ongoing excavation at the Project site. The City did not object, and the trial court appears to have granted the request.

In support of his claim for declaratory relief, Donald Wilson testified that he objected to the City's "contracting to condemn" Wilson's property. Counsel for the City objected that there was no evidence the City had taken any action to take Wilson's property, and the trial court noted, "That's a little premature here I think. It hasn't happened." Later in the proceedings, the trial court again questioned whether the timing of Wilson's challenge to the City's eminent domain power was appropriate.[6] Counsel for the City argued that Wilson's claim was not ripe because the City had not initiated any kind of condemnation proceedings against Wilson's property, and she explained that the ADDA imposed no legal obligation on the City to do so. In response, Donald Wilson argued that "this is the only time the court can *rule in advance* on whether or not I get to keep my property." (Italics added.) Counsel for the City replied that Wilson would have an opportunity to challenge any possible future condemnation proceeding should such a proceeding be filed, and she reiterated the City's position that Wilson's challenge was not ripe. She explained that Wilson's property was not the subject of the ADDA, save with respect to the Business Points, which were "not an agreement but simply points upon which an agreement is hoped to be negotiated." In the end, the trial court announced it would rule in Wilson's favor on the eminent domain issue.

### Posttrial Proceedings

After the trial, the parties exchanged briefs. A hearing was set for August 2005, but was continued several times and did not occur until June 15, 2007. At that hearing, the City's counsel argued that the Project had been completed and thus the case was moot. She noted that Wilson had not sought to stop construction and that the Project had been completed without any need to take Wilson's property.

The trial court ruled from the bench on Wilson's CEQA challenge and announced that it would dispose of "the other eight or nine issues" by adopting "the positions put forth by [Wilson] as to each of those issues." Without further specifying what the issues were, the court directed Wilson to prepare a proposed statement of decision.

On July 30, 2007, Wilson served a proposed statement of decision, to which the City later filed extensive written objections. The City objected that

---

[6] The trial court stated: "Since it hasn't yet been condemned; when it does get condemned; that it occurs to me that would be the time to challenge whether they can do it or not. I'd be operating here in a vacuum; because although they have the right to condemn it, . . . they haven't actually done it yet. I don't think it's right."

the proposed statement of decision included decisions on issues that were not raised in either the pleadings or during trial. In addition, the City argued declaratory relief was not appropriate because the Project had been completed without the City having any need to acquire Wilson's property. The City also contended the court lacked jurisdiction because the case had been mooted since "all of the various components of the project contemplated in the ADDA were completed."

On October 19, 2007, Wilson filed general responses to the City's objections. Regarding the City's objection that the proposed decision included unpled claims, Wilson asserted it had made a motion to conform its pleadings to proof at the close of the case. It further asserted the case was not mooted by completion of construction because there was no evidence that "all the performances required under the ADDA are complete." Alluding to its challenge to the City's eminent domain authority, Wilson argued that more parking might still be needed on Block 2 and the City "may still be required to attempt to acquire [Wilson's] property."

With its general responses, Wilson filed a "(Proposed) Revised Statement of Decision." In it, Wilson repeated the claim that it had made a motion to conform its pleadings to proof at the close of trial.[7] Addressing the City's claims regarding justiciability, the proposed revised statement of decision argued that the challenge to the City's eminent domain authority was ripe "in that the ADDA requires [the City] to try to acquire [Wilson's] property." It also rejected the City's mootness claim, stating: "Despite [the City's] assertions at the [June] 15, 2007 hearing that the project is complete and that [the City] has no intention to acquire [Wilson's] property via eminent domain, [the City] refused to stipulate at trial that they would not acquire [Wilson's] property via eminent domain, (cite transcript) no such stipulation was offered at the [June] 15, 2007 hearing, and there is no limitation in the ADDA that would prevent [the City] from being required to acquire the property *at a future time* absent a grant of the [d]eclaratory [r]elief sought." (Italics added.)

The City filed its objections to the revised proposed statement of decision on December 3, 2007. Once again, the City objected that Wilson's action was not justiciable. It contended declaratory relief was inappropriate because Wilson was not presently under any threat of losing its property. It also noted

---

[7] We are extremely troubled by this claim. We have painstakingly reviewed both the record on appeal and the reporter's transcripts of the proceedings below, and we can find absolutely no evidence that such a motion was ever made. The register of actions does not reflect the filing of any such written motion. Nor is there anything in the transcripts to indicate that the motion was made orally in open court. As it did below, the City pointed out this issue in its opening brief on appeal. Yet Wilson's brief to this court does not address this argument directly, much less provide us with a citation to the record that establishes the existence of the alleged motion to conform pleadings to proof.

that the revised proposed statement of decision failed to specify what specific relief it would award to Wilson and what practical effect the decision would have. Finally, it asserted the case was moot because the Project had been built and suggested that the court take judicial notice of that fact.

On April 25, 2008, the trial court filed the statement of decision proposed by Wilson. It found for Wilson on a number of claims, including Wilson's CEQA challenge, and invalidated the Resolutions. On May 7, 2008, the trial court entered judgment declaring that (1) the Resolutions were invalidated, (2) the City was not authorized to enter into the ADDA, (3) Wilson's property was not needed for the Project, and (4) there was no limitation in the ADDA that would prevent the City from being required to acquire Wilson's property in the future absent a grant of declaratory relief. The judgment did not order the City to take any corrective action.[8]

### Proceedings in This Court

The City filed a timely notice of appeal. In its opening brief, the City asserted Wilson's case had been mooted prior to judgment by the completion of the Project and that Wilson's claim regarding the condemnation of its property presented no actual and justiciable controversy. Wilson did not deny that the Project had been completed but asserted only that the trial court had received no evidence to demonstrate completion.

In light of the City's arguments, on June 4, 2010, we informed the parties that we intended to take judicial notice of the fact that the Project had been completed prior to issuance of the statement of decision and entry of judgment below. We therefore asked the parties to submit supplemental letter briefs addressing the propriety of judicial notice of this fact. We requested that counsel for the City inform us whether the City had adopted any resolution, ordinance, or other official act certifying completion of the Project.

The City filed a supplemental letter brief and request for judicial notice on June 15, 2010. It attached verified notices of completion for the downtown public parking facility and the "downtown retail-cinema streetscape improvements," both of which predated entry of judgment below. In addition, it attached certified copies of inspection reports showing final inspection and approval of various interior improvements at the Project site, including the completion of the 20-screen theatre buildout. These showed that most of the improvements were completed and finally approved prior to entry of judgment.

---

[8] Wilson subsequently moved for an award of attorney fees under Code of Civil Procedure section 1021.5. The hearing on that motion has been "vacated."

In its supplemental letter brief, Wilson did not contest the propriety of taking judicial notice of these documents. It argued only that these documents do not demonstrate that the Project is complete. We will therefore grant the City's June 15, 2010 request for judicial notice of these documents. (Evid. Code, §§ 452, subd. (c), 455, subd. (a), 459, subds. (a), (c), (d); see *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 907, fn. 2 [117 Cal.Rptr.2d 631].)

## DISCUSSION

The City argues first that Wilson's action was not justiciable, and thus the trial court erred by adjudicating it. The City's argument invokes two different facets of the doctrine of justiciability—mootness and ripeness. First, the City contends Wilson's claims regarding the validity of the Resolutions were rendered moot by the completion of the Project. The City asserts the trial court erred by ruling on claims for which it could grant Wilson no effective relief. Second, the City contends Wilson's request for declaratory relief is not ripe. It argues the trial court improperly ruled on the propriety of the City's power to condemn Wilson's property because it is undisputed that no condemnation has been attempted.[9]

We agree with the City. Under the rules of justiciability developed by the California courts, it is clear that the action below was nonjusticiable, and the trial court therefore abused its discretion in adjudicating it. We reverse the trial court's judgment and remand the matter to the superior court with instructions to dismiss the action.

---

[9] Regarding Wilson's CEQA claims, the City contends the trial court erred in ruling on them because Wilson failed to comply with a number of statutory prerequisites to bringing a challenge under CEQA. In addition to arguing that Wilson failed to exhaust its administrative remedies, the City first points out that Wilson's suit was not filed within the applicable 30-day statute of limitations. (Pub. Resources Code, § 21167, subd. (b).) Second, Wilson did not request that the City prepare a record of proceedings within 10 business days of filing suit. (Pub. Resources Code, § 21167.6, subd. (a).) Third, Wilson did not seek a writ of mandate, which is the sole remedy for a public agency's noncompliance with CEQA. (See Pub. Resources Code, § 21168.9; *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1028–1029 [73 Cal.Rptr.2d 841, 953 P.2d 1188].) Fourth, Wilson did not comply with the requirements of Code of Civil Procedure section 388 and Public Resources Code section 21167.7 by furnishing copies of its pleadings to the Attorney General. If a party fails to comply with the latter requirement, "[n]o relief, temporary or permanent, shall be granted until a copy of the pleading has been furnished to the Attorney General in accordance with such requirements." (Pub. Resources Code, § 21167.7.) Wilson's responsive brief in this court does not contest any of the City's arguments concerning CEQA. Because we conclude that the trial court abused its discretion by entertaining a nonjusticiable action, we need not further explore the consequences of Wilson's undisputed failure to satisfy CEQA's prerequisites to suit.

## I. *General Principles of Justiciability*

■ California courts will decide only justiciable controversies. (*County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 813 [81 Cal.Rptr.3d 461]; see 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 21, pp. 84–86.) The concept of justiciability is a tenet of common law jurisprudence and embodies "[t]he principle that courts will not entertain an action which is not founded on an actual controversy . . . ." (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22 [61 Cal.Rptr. 618] (*California Water*); see also *Stonehouse Homes LLC v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 540 [84 Cal.Rptr.3d 223] (*Stonehouse Homes*).) Justiciability thus "involves the intertwined criteria of ripeness and standing. A controversy is 'ripe' when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made." (*California Water*, at p. 22, fn. omitted.) But "ripeness is not a static state" (*Consumer Cause, Inc. v. Johnson & Johnson* (2005) 132 Cal.App.4th 1175, 1183 [34 Cal.Rptr.3d 258]), and a case that presents a true controversy at its inception becomes moot " 'if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character' " (*Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453 [246 P.2d 688]).

■ Witkin provides a succinct summary of these two categories of cases. Unripe cases are "[t]hose in which parties seek a judicial declaration on a question of law, though no actual dispute or controversy ever existed between them requiring the declaration for its determination." (3 Witkin, Cal. Procedure, *supra*, Actions, § 21, p. 85.) ■ Moot cases, in contrast, are "[t]hose in which an actual controversy did exist but, by the passage of time or a change in circumstances, ceased to exist." (*Id.* at p. 86.) Because the case before us raises problems of both ripeness and mootness, we will lay out some of the basic principles underlying these doctrines.

■ The ripeness element of the doctrine of justiciability is intended to prevent courts from issuing purely advisory opinions. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170 [188 Cal.Rptr. 104, 655 P.2d 306] (*Pacific Legal Foundation*).) It is "primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy." (*Ibid.*) In an action for declaratory relief under Code of Civil Procedure section 1060, an " 'actual controversy' . . . is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not

suggest, what the parties may or may not do. [Citations.]" (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 117 [109 Cal.Rptr. 799, 514 P.2d 111] (*Selby*).)

■ A case is considered moot when "the question addressed was at one time a live issue in the case," but has been deprived of life "because of events occurring after the judicial process was initiated." (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 120 [145 Cal.Rptr. 674, 577 P.2d 1014].) Because " 'the duty of . . . every . . . judicial tribunal . . . is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or . . . to declare principles or rules of law which cannot affect the matter in issue in the case before it[,] [i]t necessarily follows that when . . . an event occurs which renders it impossible for [the] court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment . . . .' [Citations.]" (*Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725].) The pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any effectual relief. (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 227 [123 Cal.Rptr.2d 735]; see also *Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1557 [92 Cal.Rptr.3d 219] [case moot where contract with county had expired and court could not award it to disappointed bidder].) If events have made such relief impracticable, the controversy has become "overripe" and is therefore moot. (*California Water, supra,* 253 Cal.App.2d at pp. 22–23, fn. 9; see *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132 [41 Cal.Rptr. 468, 396 P.2d 924].)

■ Thus, " '[m]ootness has been described as " 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).' " [Citations.]' " (*Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1008 [106 Cal.Rptr.2d 381], quoting *Arizonans for Official English v. Arizona* (1997) 520 U.S. 43, 68, fn. 22 [137 L.Ed.2d 170, 117 S.Ct. 1055].) When events render a case moot, the court, whether trial or appellate, should generally dismiss it. (See *Lillbask ex rel. Mauclaire v. Connecticut Dept. of Education* (2d Cir. 2005) 397 F.3d 77, 84; see also *Consumer Cause, Inc. v. Johnson & Johnson, supra,* 132 Cal.App.4th at p. 1183 [trial court should have refused to decide case upon plaintiff's discovery that allegations of complaint were wrong and defendant was not violating statute at issue].)

II. *Wilson's Challenges to the Validity of the Resolutions Became Moot Before Entry of Judgment*

The City contends Wilson's claims regarding the validity of the Resolutions were moot at the time the trial court decided them. It asserts that completion of the Project deprived the controversy of life and that the trial court's ruling invalidating the Resolutions gave Wilson no meaningful relief. The City notes the trial court's ruling did not and could not halt the Project, which had been completed by the time of judgment. Nor did the trial court order preparation of a subsequent EIR or the renegotiation of the ADDA. Thus, the City argues that we must reverse the judgment for lack of jurisdiction. We agree with the City that reversal is required.[10]

A. *Completion of the Project Mooted Wilson's Challenges to the ADDA*

■ California law has long recognized that the completion of a public works project moots challenges to the validity of the contracts under which the project was carried out. In *Jennings v. Strathmore Public etc. Dist.* (1951) 102 Cal.App.2d 548 [227 P.2d 838] (*Jennings*), the plaintiff, a " 'citizen resident' " of the public utility district, filed suit to enjoin the construction of facilities for the sewer district and sought a declaration that two contracts for construction of a sewer system were void. (*Id.* at pp. 548–549.) The plaintiff alleged that the sewer district entered into the contracts in bad faith for the purpose of evading the requirements of the Labor Code by setting a prevailing wage rate that was below the general wage rate for similar work. (*Jennings*, at p. 549.) After first concluding that completion of construction had made the request for injunctive relief moot, the court went on to consider whether the plaintiff could still maintain his action for declaratory relief. (*Id.* at pp. 549–550.) The court held that he could not, explaining that "[if the] plaintiff could maintain such an action because he did not like the prevailing wage scale fixed, after the work was nearly done, then any claimed 'citizen resident' could, at any time, without limitation, bring an action to declare such contracts void." (*Id.* at p. 551.) The court granted the defendant district's motion to dismiss the appeal as moot, stating, "a decision as to the validity of the contracts, at this time, after the work has been completed and after the payments have been made and where no relief, under the complaint could be afforded plaintiff, would be purely academic and would serve no useful purpose." (*Ibid.*)

---

[10] While we agree with the City that we must reverse the judgment, we do not view the issue before us as one of subject matter jurisdiction. (See *City of Plymouth v. Superior Court* (1970) 8 Cal.App.3d 454, 460 [96 Cal.Rptr. 636] [questioning whether mootness is a jurisdictional defect].) We clarify this point so that our opinion is not misinterpreted as making what Justice Scalia has colorfully termed a "drive-by jurisdictional ruling[]." (*Steel Co. v. Citizens for Better Environment* (1998) 523 U.S. 83, 91 [140 L.Ed.2d 210, 118 S.Ct. 1003].)

■ A project's completion also moots requests to set aside or rescind resolutions authorizing the project. (*Roscoe v. Goodale* (1951) 105 Cal.App.2d 271, 273 [232 P.2d 879] [completion of improvements to sewage and water system rendered moot petitioner's request to rescind city council resolution under which work was carried out].) It also moots an action seeking to require preparation of an EIR for a particular project. (See *Hixon v. County of Los Angeles* (1974) 38 Cal.App.3d 370, 378–379 [113 Cal.Rptr. 433] [cutting down of trees for first phase of project rendered moot request for writ of mandate to compel preparation of EIR for that phase].) The completion of the Project prior to the trial court's entry of judgment therefore meant that nothing could be accomplished by invalidation of the Resolutions, and it follows that Wilson's action was rendered moot. (See *Downtown Palo Alto Com. for Fair Assessment v. City Council* (1986) 180 Cal.App.3d 384, 391 [225 Cal.Rptr. 559] [holding appeal moot where "[t]he validity of the ordinance is no longer of consequence to the parties before this court"].)

### B. *Wilson's Counterarguments Are Unpersuasive*

Wilson urges that its claims are not moot for a number of reasons. First, it asserts that completion of the Project would not moot the action because "[i]nvalidation of the Resolutions caused the title to the air-space, and thus [the Project], to revert to the City." Second, in its supplemental brief, Wilson argues that the Project is not truly complete and that "a validation action precludes the possibility of any party acquiring vested rights in the subject matter of the transaction until judgment is entered determining its legality." Third, Wilson contends that the Developer proceeded at its own risk by commencing construction before final judgment in the validation action. None of these arguments is persuasive.

### 1. *Title to the Air Rights Parcel Did Not Revert to the City*

Contrary to Wilson's contention, invalidation of the Resolutions has not caused title to the air space and the retail-cinema portion of the Project to revert to the City. Wilson did not specifically request this relief in the FAC, and it is not mentioned in Wilson's trial brief. This is perhaps unsurprising, because in the court below Wilson took the position that the ADDA did not provide for any such transfer of air rights. In any event, the City pointed out prior to trial that the conveyance of the air rights parcel had already occurred and Wilson had not sought to enjoin it. Wilson did not dispute that the conveyance had taken place, and despite having been alerted to the issue, it did not ask the trial court to invalidate the transfer and return title to the City. And although the trial court did invalidate the Resolutions, it did not expressly return title to the air space to the City.

Wilson's statements to the trial court confirm that it never sought reconveyance of the air rights parcel to the City. When the trial court asked what relief Wilson was seeking, Wilson's counsel replied: "What we want is, we want the hearing that should have happened." Donald Wilson explained that he wanted the court to "invalidate it and send it back; because the notice was inadequate." But when the trial court asked Wilson's counsel what effect his requested relief would have on the Project, counsel responded, "I suspect nothing." The trial court pressed further, asking Donald Wilson directly whether he was "trying to stop the garage and fill in the hole," and Wilson's answer was no.

The record demonstrates that Wilson did not request that the trial court return title to the air rights parcel to the City. It further demonstrates Wilson's understanding that the relief it did request would have no practical effect on the Project. Wilson cannot escape a finding of mootness merely by asserting—for the first time on appeal—that the trial court's judgment effected a reconveyance of title Wilson did not request and the trial court did not expressly order.

### 2. *Substantial Completion of the Project Is Sufficient to Moot Wilson's Claims*

█ Wilson argues in its supplemental brief that the Project is still not entirely complete, and therefore the action was not moot when the trial court rendered judgment. We disagree because a project need not be complete in every detail before challenges to its approval will become moot. As the court in *Jennings, supra*, 102 Cal.App.2d 548 pointed out, the plaintiff could not maintain an action for declaratory relief "after the work was *nearly done*." (*Id.* at p. 551, italics added.) Substantial completion of the Project rendered Wilson's challenges to the validity of the Resolutions moot.

Both state and federal courts generally refuse to hear challenges either to permits or contracts for construction once the construction has been substantially completed. Thus, the Fifth Circuit has held that the substantial completion of a retail complex rendered moot challenges to the validity of an Army Corps of Engineers permit for construction of the complex. (*Bayou Liberty Assn. v. U.S. Army Corps* (5th Cir. 2000) 217 F.3d 393, 397.) Similarly, where a plaintiff sought only declaratory and injunctive relief on the ground that the contract for construction of a sewer treatment facility had been improperly awarded to another bidder, the Seventh Circuit held the matter moot because the facility was 98 percent complete. (*James Luterbach Construction Co., Inc. v. Adamkus* (7th Cir. 1986) 781 F.2d 599, 602; accord, *Florida Wildlife Federation v. Goldschmidt* (5th Cir. 1980) 611 F.2d 547, 549 [where construction activity sought to be enjoined had already substantially occurred,

action was moot]; *Zoning Bd. of Adjustment v. DeVilbiss* (Colo. 1986) 729 P.2d 353, 360 [challenge to zoning board's approval of height variance rendered moot by completion of construction of facility]; *Rath v. City of Sutton* (2004) 267 Neb. 265, 272–274 [673 N.W.2d 869, 879–881] [completion of wastewater treatment facility rendered taxpayer's claims for injunctive and declaratory relief moot]; *Citineighbors Coalition v. New York City Landmarks* (2004) 2 N.Y.3d 727, 728–730 [778 N.Y.S.2d 740, 741–743, 811 N.E.2d 2, 3–5] [substantial completion of addition to building rendered moot challenge to certificate of approval from city landmarks commission].)

In its supplemental brief, Wilson also takes the position that completion of the physical structure of the Project does not mean the Project is "complete." It concedes that the "theatre shell" was in existence before the entry of judgment, and it further concedes that "the theatre portion of the project is open and operating," but asserts that completion must be determined solely by reference to the terms of the ADDA. Wilson relies on the definition of the Project in section 107 of the ADDA, but that definition actually supports the conclusion that the Project is substantially complete.[11] The documents attached to the City's request for judicial notice establish that prior to entry of judgment, the City had issued notices of completion for both the underground parking facility and the street improvements associated with the Project. In addition, the documents demonstrate that the theatre buildout was also completed prior to entry of judgment, as were most of the interior improvements for the building's retail and restaurant tenants. Thus, even judged solely by the definition provided in the ADDA, the Project is substantially complete.

Unlike Wilson, we do not find it significant that the City has not produced a "certificate of completion" for the Project. Section 517 of the ADDA states only that "after completion of all construction to be completed by Developer for the Project, Developer *may* notify the Agency that construction is complete *and request* issuance of the Certificate of Completion." (Italics added.) The ADDA contains no requirement that the Developer request such a certificate, and the City's obligation to issue one is contingent upon the

---

[11] Attachment 1 to the ADDA includes the definitions of key terms used in the agreement; it defines "Project" as having the "meaning set forth in <u>Section 107</u> of this Agreement." (Original underscoring.) Section 107 states in relevant part: "The Project consists of construction on the Project Site of a two-level retail-cinema project, with approximately 85,000 square feet of retail shop and restaurant space on the ground level, a 20-screen, 4,200-seat theatre on the second level, and approximately 590 parking spaces located in an underground parking facility on the Project Site that extends beneath the adjacent Middlefield Road right-of-way. The City will use its best efforts and legally available means to provide additional parking as more particularly described in the Parking Facilities Agreement."

Developer's request. The absence of a certificate of completion therefore does not mean the Project is not yet complete.[12]

### 3. *Validation Actions Are Not Immune From Mootness*

Citing *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880 [92 Cal.Rptr.2d 268] (*Woodward Park*) and *Neilson v. City of California City* (2007) 146 Cal.App.4th 633 [53 Cal.Rptr.3d 143] (*Neilson*), Wilson contends that the Developer proceeded at its own risk by commencing construction before final judgment in the action below. More broadly, it also asserts that the nature of a validation action "precludes the possibility of any party acquiring vested rights in the subject matter of the transaction until judgment is entered determining its validity." Once again, we disagree.

To the extent that Wilson appears to argue that validation actions are somehow exempt from ordinary rules of justiciability, it is incorrect. Like all other actions, validation actions must be justiciable. (See *City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 66 [24 Cal.Rptr.3d 72] [validation action must satisfy requirements of ripeness and standing].) Consequently, a validation action may well become moot if the challenged redevelopment project is allowed to proceed during the pendency of the action. (See *Millbrae School Dist. v. Superior Court* (1989) 209 Cal.App.3d 1494, 1496–1497 [261 Cal.Rptr. 409] ["In order to *prevent mootness*, we would be obliged to issue a *stay of the redevelopment* while the appeal was pending . . . ." (italics added)].) As discussed earlier, Wilson sought no stay of the construction and indeed indicated that it was not interested in stopping it. Its reverse validation action was thus no less vulnerable to mootness than any other action.

Regarding Wilson's claim that the Developer proceeded at its own risk, the cases upon which Wilson relies are not on point. *Woodward Park, supra,* 77 Cal.App.4th 880 is distinguishable on its facts. There, a homeowners association challenged the approval of a carwash project proposed by a corporation. (*Id.* at pp. 881–882.) The trial court entered a judgment ruling that the city

---

[12] Wilson relies on cases from other areas of law that discuss when a contract for construction is complete. The cases cited arose in very different factual contexts and construed specific contractual or statutory language. They are therefore inapposite. (See *North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, 285–287 [99 Cal.Rptr.3d 225] [dispute between insurers over meaning of " 'completed operations' " clause in insurance policy; Court of Appeal affirmed trial court's factual finding that residence was not "completed" when homeowner moved in]; *Howard S. Wright Construction Co. v. BBIC Investors, LLC* (2006) 136 Cal.App.4th 228, 236, 240 [38 Cal.Rptr.3d 769] [construing Civ. Code, §§ 3086 and 3115 to resolve question of timeliness of mechanic's lien; court notes "a contractor completes the contract upon *substantial performance* of its obligations" (italics added)].)

was required under CEQA to prepare an EIR before approving the project. (*Woodward Park*, at pp. 882, 889.) Despite the pending proceeding and the trial court order, the corporation completed construction without obtaining an EIR and began to operate the carwash. (*Id.* at p. 889.) The Court of Appeal affirmed the trial court judgment, holding that the completion and operation of the carwash did not render the case moot on appeal. (*Id.* at pp. 888–890.) The court held that effective relief was still possible since a decision requiring "preparation of an EIR could result in modification of the project to mitigate adverse impacts or even removal of the project altogether." (*Id.* at p. 888.) Clearly, the *Woodward Park* court was concerned about the public policy effects of finding the appeal moot on the facts before it. The court observed: "[D]espite the trial court's order mandating the preparation of an EIR, the [c]ity chose to delay preparation of the EIR and [the corporation] chose to operate the facility absent the EIR. It would hardly be sound public policy to allow a party to avoid CEQA by continuing with construction of a project in the face of litigation, delaying preparation of a court-ordered EIR pending appeal, and then arguing the case is moot because the project has been completed and is operating."[13] (77 Cal.App.4th at p. 889.)

In this case, in contrast, neither the Developer nor the City proceeded in violation of a court order. Wilson filed suit in February 2003, but for reasons not apparent from the record, this matter did not go to trial until May 2004. The parties did not submit their supplemental posttrial briefs until August 2005, and the hearing on the matters briefed was continued several times before it finally took place almost two years later on June 15, 2007. At that hearing, the City's counsel informed the court that the Project was completed and that the case had become moot. The trial court did not issue its statement of decision invalidating the Resolutions until 10 months later, on April 25, 2008, well *after* the Project had been substantially completed.

■ Validation actions are intended to settle promptly all questions about the validity of an agency's action. (E.g., *McLeod v. Vista Unified School Dist.* (2008) 158 Cal.App.4th 1156, 1166 [71 Cal.Rptr.3d 109].) Here, for reasons not disclosed by the record, resolution of the case was anything but prompt, and we think it would be unreasonable to expect the City and the Developer simply to hold the Project in abeyance for five years as they awaited a final

---

[13] Wilson also relies on dictum from *Neilson, supra,* 146 Cal.App.4th 633. In that case the Court of Appeal held a city's finding of blight was based on an erroneous reading of California's Community Redevelopment Law (Health & Saf. Code, § 33000 et seq.), and it invalidated approval of the redevelopment plan. (*Neilson*, at pp. 635–636, 644–645.) Responding to an argument made by an amicus curiae, the court observed in a footnote that "[g]enerally, when a party to litigation decides to proceed with a project before the judgment in that litigation is final, that party has assumed the risk of reversal. [Citation.]" (*Id.* at p. 641, fn. 9.) The sole authority cited for this proposition is *Woodward Park*, which is distinguishable for the reasons set forth above.

judgment in this reverse validation action. Thus, contrary to Wilson's suggestion, there was no "unseemly race to completion intended to moot [Wilson's] lawsuit." (*Citineighbors Coalition v. New York City Landmarks, supra*, 2 N.Y.3d at p. 729 [778 N.Y.S.2d at p. 742, 811 N.E.2d at p. 4].)

Wilson is also partially responsible for its claims becoming moot. It failed to seek a stay of the Project's construction and, as explained earlier, completion of the Project deprived the controversy of life. Had Wilson asked the trial court to stay construction pending a decision on its claims, this problem might have been avoided. (See *Fair v. U.S. E.P.A.* (9th Cir. 1986) 795 F.2d 851, 854–855 [appellants' challenge to construction of sewer became moot on appeal when sewer was completed; appellants responsible for mootness because they failed to request stay pending appeal].) Even if Wilson erroneously believed it had sufficient time to litigate its claims to judgment before completion of the Project, that does not justify its failure to seek a stay. (See *Environmental Coalition of Orange County, Inc. v. Local Agency Formation Com.* (1980) 110 Cal.App.3d 164, 173 [167 Cal.Rptr. 735].) "Since [Wilson] made no effort to seek preliminary injunctive relief or a stay order in order to preserve the status quo, [it] is not in any position to complain of the very change in circumstances that [it] might have prevented by seeking such relief." (*Zoning Bd. of Adjustment v. DeVilbiss, supra*, 729 P.2d at p. 359, fn. omitted.)

III. *Wilson's Request for Declaratory Relief to Prevent Future Condemnation of Its Property Was Not Ripe*

The trial court found that an actual and justiciable controversy existed between the parties and thus declaratory relief was appropriate. It based this finding on Wilson's ownership of property in the area affected by the Project. It further concluded the matter was ripe because "the ADDA requires [the City] to try to acquire [Wilson's] property." It pointed to the language in the Business Points in which the City stated it would "use its best efforts and legally available means to acquire the remaining parcels," and noted that funds for the acquisition of Wilson's property had already been obtained. The trial court explained that Wilson was under threat of losing its property by eminent domain and that "there is no limitation in the ADDA that would prevent [the City] from being required to acquire the property at a future time absent a grant of the [d]eclaratory [r]elief sought."

The City contends that there was no actual and justiciable controversy concerning Wilson's claim that its property might be condemned at some future date because it is undisputed that the Project was completed before the statement of decision was issued and no attempt has been made to acquire Wilson's property. In the City's view, any such claim is based purely on speculation and is therefore unripe. We agree.

 To qualify for declaratory relief, Wilson would have to demonstrate its action presented two essential elements: "(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [Wilson's] rights or obligations . . . . [Citation.]" (*Brownfield v. Daniel Freeman Marina Hospital* (1989) 208 Cal.App.3d 405, 410 [256 Cal.Rptr. 240] (*Brownfield*).) A declaration of rights or duties with respect to property may be a proper subject of declaratory relief. (Code Civ. Proc., § 1060; *Stonehouse Homes, supra*, 167 Cal.App.4th at p. 539.) But even assuming that Wilson's action satisfies the first requirement, it must still present an "actual controversy." (Code Civ. Proc., § 1060.) "The 'actual controversy' language in Code of Civil Procedure section 1060 encompasses a *probable* future controversy relating to the legal rights and duties of the parties. [Citation.]" (*Environmental Defense Project of Sierra County v. County of Sierra* (2008) 158 Cal.App.4th 877, 885 [70 Cal.Rptr.3d 474], italics added.) It does not embrace controversies that are "conjectural, anticipated to occur in the future, or an attempt to obtain an advisory opinion from the court." (*Brownfield*, at p. 410.) Thus, while a party may seek declaratory judgment before an actual invasion of rights has occurred, it must still demonstrate that the controversy is justiciable. (See *Burke v. City etc. of San Francisco* (1968) 258 Cal.App.2d 32, 34 [65 Cal.Rptr. 539].) And to be justiciable, the controversy must be ripe. (*Stonehouse Homes*, at p. 540.)

" 'Whether a claim presents an "actual controversy" within the meaning of Code of Civil Procedure section 1060 is a question of law that we review de novo.' [Citation.]" (*American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 741 [102 Cal.Rptr.3d 759].) The same standard of review applies when we determine whether a matter is ripe for adjudication. (*Farm Sanctuary, Inc. v. Department of Food & Agriculture* (1998) 63 Cal.App.4th 495, 501, fn. 5 [74 Cal.Rptr.2d 75] (*Farm Sanctuary*).) "To determine whether an issue is ripe for review, we evaluate two questions: the fitness of the issue for judicial decision and the hardship that may result from withholding court consideration. [Citation.]" (*Security National Guaranty, Inc. v. California Coastal Com.* (2008) 159 Cal.App.4th 402, 418 [71 Cal.Rptr.3d 522].) As we explain, the record in this case demonstrates that Wilson's claims regarding the possible condemnation of its property were not ripe and thus presented no actual controversy that the trial court could adjudicate.

### A. *The Issue Is Not Fit for Immediate Judicial Resolution*

 The first prong of the ripeness analysis requires us to determine whether the issue is "appropriate for immediate judicial resolution." (*Pacific Legal Foundation, supra*, 33 Cal.3d at p. 172.) "Under the first prong, the courts will decline to adjudicate a dispute if 'the abstract posture of [the] proceeding makes it difficult to evaluate . . . the issues' [citation], if the court

is asked to speculate on the resolution of hypothetical situations [citation], or if the case presents a 'contrived inquiry' [citation]." (*Farm Sanctuary, supra*, 63 Cal.App.4th at p. 502.) Wilson's action cannot satisfy this first prong because it required the trial court to speculate on the resolution of an entirely hypothetical situation—the possible condemnation of Wilson's property. (See *ibid.*)

Wilson sought declaratory relief to protect its property from possible *future* condemnation. Its efforts to demonstrate that this claim was ripe are unconvincing.[14] Wilson relies heavily on language in the Business Points in which the City stated that it "will use its best efforts and legally available means to acquire the remaining parcels" on Block 2. The first flaw in this argument is that the Business Points are not a binding agreement. Instead, they are "principles for the negotiation of a Parking Facilities Agreement for the Project," and the parties expressly stipulated that "execution of [the Business Points] *will not bind or obligate the signatories until all the signatories execute the final Parking Facilities Agreement.*" (Italics added.) Moreover, the City took pains to note that it could not "commit to making the acquisition before a legally required eminent domain public hearing is held." The Business Points thus constitute no more than "a general outline of the basic terms" of an agreement to be negotiated in the future. Resolution of Wilson's claim therefore required the trial court to speculate not only on the content of the future parking facilities agreement, but also on whether the City would take the legislative steps necessary to initiate eminent domain proceedings against Wilson's property. The abstract posture of such a claim makes it too uncertain to constitute a justiciable controversy. (See *Stonehouse Homes, supra*, 167 Cal.App.4th at p. 541 [holding unripe developer's declaratory judgment action challenging city resolution that merely directed committee to prepare recommendations for future legislation to amend zoning ordinance].)

This case resembles *Silva v. City & County of San Francisco* (1948) 87 Cal.App.2d 784 [198 P.2d 78]. In that case, the board of supervisors had declared that the plaintiff's land would be acquired " 'when necessary' " and had allocated money in the city's budget for purchase of the land. (*Id.* at p. 786.) The plaintiff sought a declaration that the proper value of his land was $10,000 "and that *if* and *when* defendant chooses to take the property this will be the amount it must pay." (*Id.* at p. 789.) The court held the case presented no actual controversy because the city "does not deem it 'necessary' to acquire the property through condemnation proceedings." (*Ibid.*)

---

[14] The mere inclusion of Wilson's property in the redevelopment area does not suffice to make the controversy ripe, since "the adoption of a redevelopment plan still falls 'several leagues short of a firm declaration of an intention to condemn property.' " (*Cambria Spring Co. v. City of Pico Rivera* (1985) 171 Cal.App.3d 1080, 1097 [217 Cal.Rptr. 772], quoting *Selby, supra*, 10 Cal.3d at p. 119.)

Thus, "[t]he only declaratory judgment that could be rendered under the allegations of the complaint would be of an advisory nature . . . ." (*Ibid.*)

The same is true here. The City has taken no steps to acquire Wilson's property, and, indeed, it may never do so. As our Supreme Court explained in *Selby, supra,* 10 Cal.3d at page 118, "[w]hether eventually any part of plaintiff's land will be taken . . . depends upon unpredictable future events." (See also *Pacific Legal Foundation, supra,* 33 Cal.3d at p. 173 ["The primary concern expressed in *Selby* was that courts not be drawn into disputes which depend for their immediacy on speculative future events."].) Former Justice Reynoso might well have been describing this case when he wrote: "In this case there has been no actual taking, no enforced public use, and no prevention of use by the owner, and there has been no eminent domain proceeding. If the public acquisition becomes a reality remedies are available. Meanwhile, the court may not speculate on the future intention of a public agency."[15] (*Viso v. State of California* (1979) 92 Cal.App.3d 15, 24 [154 Cal.Rptr. 580].)

### B. *Wilson Will Suffer No Hardship from Delaying Review*

Nor will Wilson suffer any hardship from a refusal to entertain its challenge to the City's potential future use of its eminent domain powers. It is undisputed that the City has not yet sought to condemn Wilson's property. Indeed, the trial court found, and the City admitted below, that Wilson's property is not needed for the Project. If the City should determine that Wilson's property is needed for some *future* project, the law requires the City to make a specific finding of that need before exercising its eminent domain powers. (Code Civ. Proc., § 1240.030, subd. (c).) To do so, it would have to adopt a "resolution of necessity," which it admittedly has yet to do. (Code Civ. Proc., § 1245.220; *Santa Cruz County Redevelopment Agency v. Izant* (1995) 37 Cal.App.4th 141, 149 [43 Cal.Rptr.2d 366] ["A resolution of necessity is a prerequisite to beginning a condemnation action. [Citations.]"].) No such resolution could be adopted without giving Wilson notice and an opportunity to be heard on whether its property is truly needed for any proposed project.

---

[15] Wilson's other arguments are equally unavailing. Wilson contends that any future condemnation proceeding to acquire its property would fail under issue preclusion principles, because the declaratory judgment "has barred the City from establishing one of the required elements of an eminent domain suit, that public necessity requires the project." Assuming solely for purposes of argument that this contention is accurate, it further demonstrates that Wilson's claim is not ripe, for it implicitly acknowledges that the declaratory judgment did not resolve an actual, present controversy, but served only to dictate the result of a possible future condemnation action. (Cf. *Consumer Cause, Inc. v. Johnson & Johnson, supra,* 132 Cal.App.4th at p. 1187 [court "may not enter a judgment which, rather than resolving a dispute between the parties, purports to act like legislation" by regulating acts which may be undertaken at some time in the future].)

(Code Civ. Proc., § 1245.235, subds. (a), (c).) Even if the City were to adopt such a resolution, Wilson could challenge its validity either before commencement of any eminent domain proceeding by filing a writ of mandate under Code of Civil Procedure section 1085 or after the commencement of the proceeding by objecting to the City's right to take its property. (Code Civ. Proc., § 1245.255, subd. (a)(1) & (2); see *Redevelopment Agency v. Rados Bros.* (2001) 95 Cal.App.4th 309, 316 [115 Cal.Rptr.2d 234].) Thus, if the City ever does move to condemn Wilson's property, Wilson may pursue appropriate legal remedies at that time. (*Selby, supra,* 10 Cal.3d at p. 118.)

## IV. *Conclusion*

■ To summarize, we hold that while Wilson's challenge to the validity of the Resolutions may have presented a ripe controversy at its inception, the status of the case changed once the Project was substantially completed. (See *Consumer Cause, Inc. v. Johnson & Johnson, supra,* 132 Cal.App.4th at p. 1183.) "At that point, there was no longer a controversy before the trial court, and the court should have exercised its discretion by refusing to decide it. [Citation.]" (*Id.* at pp. 1183–1184.) Because Wilson's claims had clearly become moot, the trial court abused its discretion in failing to dismiss Wilson's challenges to the validity of the Resolutions. (See *Zetterberg v. State Dept. of Public Health* (1974) 43 Cal.App.3d 657, 665 [118 Cal.Rptr. 100].)

Similarly, Wilson's challenge to the City's possible future exercise of its eminent domain authority is not ripe. The posture of this case would "require a court to speculate about unpredictable future events in order to evaluate the parties' claims." (*PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1217 [13 Cal.Rptr.3d 630].) Wilson's claimed uncertainty about the City's future intentions with regard to its property does not give rise to a justiciable controversy. (*Stonehouse Homes, supra,* 167 Cal.App.4th at p. 542.) If the City does decide to implement its redevelopment plan so as to affect Wilson's free use of its property, Wilson may challenge the City's action at that time. (*Selby, supra,* 10 Cal.3d at p. 118.) In the absence of a ripe controversy, the trial court abused its discretion in entertaining the action and declaring the rights of the parties. (*Sherwyn v. Department of Social Services* (1985) 173 Cal.App.3d 52, 59 [218 Cal.Rptr. 778].)

■ Where the trial court has decided a nonjusticiable controversy, the appropriate course is to reverse its judgment and to remand the matter to the trial court with directions to dismiss the action. (*Giles v. Horn, supra,* 100 Cal.App.4th at p. 229; *Sherwyn v. Department of Social Services, supra,* 173 Cal.App.3d at p. 59.) We follow that course here. Since we reverse the judgment in Wilson's favor, it necessarily follows that Wilson is not entitled to attorney fees in the trial court. (See, e.g., *California Grocers Assn. v. Bank*

*of America* (1994) 22 Cal.App.4th 205, 220 [27 Cal.Rptr.2d 396] ["An order awarding [attorney] fees 'falls with a reversal of the judgment on which it is based.' [Citation.]"].)

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to dismiss the action. Costs to the City. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Needham, J., and Bruiniers, J., concurred.

A petition for a rehearing was denied February 23, 2011, and respondent's petition for review by the Supreme Court was denied April 27, 2011, S191199.