Filed 6/2/15  Yuba Group Against Garbage v. City and County of San Francisco CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| YUBA GROUP AGAINST GARBAGE,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>      Defendants and Respondents;<br><br>RECOLOGY SAN FRANCISCO et al.,<br><br>      Real Parties in Interest. | A139409<br><br>(City & County of San Francisco<br>Super. Ct. No. CPF-11-511545) |

This appeal challenges the adequacy of the City and County of San Francisco's (the "City") compliance with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) with respect to two contracts, now since terminated, concerning the transportation of waste by rail from San Francisco County to Yuba County.  The trial court dismissed the petition for writ of mandate filed by Yuba Group Against Garbage ("YuGAG"), after sustaining the City's demurrer without leave to amend, on the grounds that the action was both moot and not ripe.  We affirm.

## I. BACKGROUND

### A.      *Original Agreements Regarding Disposal and Transportation of Waste*

In 1987, the City entered two agreements, both still in effect, that govern the City's disposal and transportation of municipal solid waste.  In the first agreement, the City, and the predecessors of both Waste Management of Alameda County ("WMAC")

1

and Recology San Francisco ("Recology") agreed that WMAC's Altamont Landfill in Livermore, California would be the exclusive site for the disposal of the City's solid waste up to 15 million tons of waste or 65 years, whichever occurred earlier ("1987 Waste Disposal Agreement"). In the second agreement, Recology—in its capacity as the licensed refuse collection and hauling company in the City—agreed to operate a transfer station in the City and deliver waste to the Altamont Landfill ("1987 Facilitation Agreement").

B.      *Requests for Proposals*

In February 2009, in anticipation of the exhaustion of the disposal capacity limit under the 1987 Waste Disposal Agreement, the City issued a Request for Proposal for Landfill Disposal Capacity ("RFP"). Both WMAC and Recology submitted proposals. WMAC's bid proposed continuing the current disposal process, with Recology taking the waste from the transfer station and transporting it to the Altamont Landfill. Recology, on the other hand, proposed that the City relocate waste disposal to Recology's Ostrom Road Landfill in Yuba County, with Recology transporting the waste out of the City by truck and then transporting it by rail from the Port of Oakland to the Ostrom Road Landfill and, as a back-up, Recology's Hay Road Landfill in Vacaville ("Green Rail Project").

In September 2009, after evaluating the proposals, the City issued a notice of intent to award the disposal contract to Recology. The award was "contingent upon successful negotiation of a contract for these service and approval of the contract by the San Francisco Board of Supervisors."

C.      *New Agreements*

On July 28, 2011, the City and Recology executed two agreements (the "2011 Agreements"): 1) a Landfill Disposal Agreement ("2011 Landfill Agreement"), and 2) an amendment to the existing 1987 Facilitation Agreement entitled Amended and Restated Facilitation Agreement ("2011 Amended Facilitation Agreement"). The 2011 Landfill Agreement designated the Ostrom Road Landfill as the exclusive disposal site for the City's solid waste. The 2011 Facilitation Agreement provided that Recology

2

would transport the City's solid waste from Recology's transfer station through the Port of Oakland to the Ostrom Road Landfill by rail.

**D.    *Commencement of Litigation***

In August 2011, YuGAG, a citizens group comprised of residents in Yuba and San Francisco Counties, filed a petition for writ of mandate pursuant to Code of Civil Procedure sections 1085 and 1094.5, alleging two causes of action.  The first cause of action alleged that the City violated CEQA by approving the Recology proposal without evaluating the significant environmental effects of relocating the City's waste disposal location from the Altamont Landfill to the Ostrom Road Landfill.  The second cause of action alleged that the City violated its own administrative code in selecting Recology through the RFP process.  According to the petition, the "scope of the services at issue in the RFP process was improperly broadened . . . to include transportation."

The prayer for relief requested a writ of mandate requiring the City to: 1) "set aside its approval" of the 2011 Agreements; 2) "suspend all activities in furtherance" of its approval; 3) "re-open the RFP process"; and 4) "conduct environmental review" for approval of the 2011 Agreements and "otherwise comply with CEQA in any subsequent action" regarding such approval.

**E.    *Subsequent Environmental Review and Termination of the 2011 Agreements***

In April 2012, the Yuba County Planning Department issued a Notice of Preparation ("NOP") for an integrated Draft Environmental Impact Report ("EIR") and Environmental Assessment as part of the CEQA review for Recology's proposed Green Rail Project and proposed amendments to the permits for the Ostrom Road Landfill ("the Project").  The Project location as described in the NOP includes Recology's San Francisco transfer station and the Oakland Rail Yard at 5th Avenue, as well as three sites in Yuba County.  The NOP states that the Draft EIR will evaluate the potential environmental impacts of both Project construction and transport of the City's waste from Recology's San Francisco transfer station to its Ostrom Road Landfill.

Based on the geographic scope of the Yuba County EIR, the City decided to join in Yuba County's environmental review efforts.  Thereafter, in November 2012, the City

3

and Recology agreed to terminate the 2011 Agreements ("Termination Agreement"). The recitals to the Termination Agreement explained that Yuba County had begun a CEQA review process that would address "the environmental impacts of the proposed activities . . . at all points between Recology's San Francisco transfer station and the Ostrom Road Landfill"; that the City had elected to participate in Yuba County's EIR process; that the City would "act to ensure that the review process is as open to the public and comprehensive as possible"; and that termination of the 2011 Agreements was necessary "[t]o facilitate the City's full and complete participation" in Yuba County's EIR process "and the City's CEQA review." The Termination Agreement states that while "Recology's proposal remains the City's preferred alternative for purposes of CEQA review, the City believes that terminating the 2011 Agreements is in the best interest of the City and the public."

Further, although the Termination Agreement states that the Recology's proposal will be the City's proposed Project for purposes of CEQA review, it also gives the City complete discretion to proceed with the Project, modify it, or select an alternative: "The City reserves full discretion to consider the Project in light of the results of the Pending CEQA Process and the City's CEQA review, including whether to approve the Project, whether to adopt possible mitigation measures that may apply, and whether to adopt any and all modifications or alternatives to the Project that might be identified through the CEQA process."

Thereafter, the City and Yuba County agreed that Yuba County would be the CEQA lead agency responsible for preparing the EIR. (See Cal. Code Regs., tit. 14, §15050, subd. (a).) They based this decision on the fact that Yuba County has the greatest regulatory responsibility for the Project as a whole because: 1) Yuba County has discretion whether to approve permit amendments that would allow the Ostrom Road Landfill to receive waste by rail; 2) the majority of construction activity would occur in Yuba County; and 3) the majority of the environmental impacts would occur in Yuba County.

Yuba County also consulted with the Governor's Office of Planning and Research ("OPR") about the designation of the lead agency. OPR advised that Yuba County would be the appropriate lead agency, and suggested that the two jurisdictions enter into a cooperative agreement, pursuant to the CEQA Guidelines, regarding their agreement as to which agency should be the lead agency, as well as how they would "cooperate and coordinate in preparation of the environmental review document for the proposed Project." (Cal. Code Regs., tit.14, § 15051, subd. (d).)

In March 2013, the City and Yuba County entered into an agreement concerning their coordinated efforts to complete environmental review of the proposed Project ("Cooperative Agreement"). The Cooperative Agreement provides that, in accordance with California Code of Regulations, title 14, sections 15051, subdivision (d) and 15367, Yuba County will act as the lead agency for purposes of environmental review under CEQA and that, in accordance with sections 15096 and 15381 of title 14, the City will act as a responsible agency. In that capacity, the City will actively participate in the CEQA process, and will rely on the Final EIR when making a decision on any discretionary approvals relating to the Project.

The Cooperative Agreement outlines the City's and Yuba County's coordinated efforts in a number of areas related to preparation of the EIR, including staffing, EIR scoping, public proceedings, working with the EIR consultant, and maintaining the administrative record. Specifically, the City and Yuba County agreed to confer about the content of the Draft EIR, "including, but not limited to, description of environmental setting, appropriate baseline(s), significance thresholds, impact determinations, mitigation measures, and a reasonable range of alternatives to the proposed Project."

After entering into the Cooperative Agreement, Yuba County circulated a revised NOP to provide notice that the City's consideration of one or more agreements with Recology for the disposal and transportation of San Francisco's waste will be addressed in the EIR. On April 17, 2013, Yuba County and the City held an additional public scoping meeting on the Draft EIR at the San Francisco Planning Department. Yuba

County also provided an additional 30-day comment period, from April 4 to May 3, 2013, for submission of comments on the scope and content of the Draft EIR.

**F.     The City's Demurrer**

After it executed the Termination Agreement, the City requested that YuGAG and another plaintiff with a similar action that had been consolidated with YuGAG's case dismiss their actions.  The other plaintiff settled with the City and dismissed its case.  YuGAG did not.  Accordingly, the City filed a demurrer to the petition, contending that YuGAG's petition was "moot and unripe because the City has already terminated the contracts at issue in this litigation."

The trial court sustained the demurrer, finding that all of YuGAG's claims were either moot or not yet ripe.  The court thereafter entered judgment against YuGAG and the instant appeal followed.

## II. DISCUSSION

**A.     Standard of Review**

We review de novo a trial court's sustaining of a demurrer, exercising our independent judgment as to whether the complaint alleges sufficient facts to state a cause of action.  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)  We assume the truth of properly pleaded allegations in the complaint and give the complaint a reasonable interpretation, reading it as a whole and with all its parts in their context.  (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.)

We apply the abuse of discretion standard in reviewing a trial court's denial of leave to amend.  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  It is the appellant's burden to show either that the trial court erred in sustaining the demurrer or abused its discretion in denying leave to amend.  (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 108 Cal.App.4th 1028, 1038.)  We may affirm the judgment if the complaint is objectionable on any of the grounds raised by the demurrer.  (*Soliz v. Williams* (1999) 74 Cal.App.4th 577, 585.)

### B.    *Principles of Justiciability*

In *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559 (*Wilson*), our colleagues in Division Five of this judicial district succinctly set forth the general principles of justiciability as follows: "California courts will decide only justiciable controversies.  (*County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 813; see 3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 21, pp. 84-86.)  The concept of justiciability is a tenet of common law jurisprudence and embodies '[t]he principle that courts will not entertain an action which is not founded on an actual controversy. . . .'  (*California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22 (*California Water*); see also *Stonehouse Homes LLC v. City of Sierra Madre* (2008) 167 Cal.App.4th 531, 540 (*Stonehouse Home*).)  Justiciability thus ' "involves the intertwined criteria of ripeness and standing.  A controversy is 'ripe' when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made." (*California Water,* at p. 22, fn. omitted.)  But 'ripeness is not a static state' (*Consumer Cause, Inc. v. Johnson & Johnson* (2005) 132 Cal.App.4th 1175, 1183), and a case that presents a true controversy at its inception becomes moot ' "if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character" ' (*Wilson v. L.A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453)."  (*Wilson, supra,* 191 Cal.App.4th at p. 1573.)

"Unripe cases are '[t]hose in which parties seek a judicial declaration on a question of law, though no actual dispute or controversy ever existed between them requiring the declaration for its determination.'  [Citation.]  Moot cases, in contrast, are '[t]hose in which an actual controversy did exist but, by the passage of time or a change in circumstances, ceased to exist.'  [Citation.]  Because the case before us raises problems of both ripeness and mootness, we will lay out some of the basic principles underlying these doctrines.

"The ripeness element of the doctrine of justiciability is intended to prevent courts from issuing purely advisory opinions.  (*Pacific Legal Foundation v. California Coastal*

7

*Com.* (1982) 33 Cal.3d 158, 170. [ ]  It is 'primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.' (*Ibid.*)  In an action for declaratory relief under Code of Civil Procedure section 1060, an ' "actual controversy" . . . is one which admits of definitive and conclusive relief by judgment within the field of judicial administration, as distinguished from an advisory opinion upon a particular or hypothetical state of facts. The judgment must decree, not suggest, what the parties may or may not do.  [Citations.]' (*Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 117 (*Selby*).)

"A case is considered moot when 'the question addressed was at one time a live issue in the case,' but has been deprived of life 'because of events occurring after the judicial process was initiated.' (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 120.) Because ' "the duty of . . . every . . . judicial tribunal is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or . . . to declare principles or rules of law which cannot affect the matter in issue in the case before it[,] [i]t necessarily follows that when . . . an event occurs which renders it impossible for [the] court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment . . . ." [Citations.]' (*Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863.) The pivotal question in determining if a case is moot is therefore whether the court can grant the plaintiff any effectual relief.  (*Giles v. Horn* (2002) 100 Cal.App.4th 206, 227; see also *Daily Journal Corp. v. County of Los Angeles* (2009) 172 Cal.App.4th 1550, 1557 [case moot where contract with county had expired and court could not award it to disappointed bidder].)  If events have made such relief impracticable, the controversy has become 'overripe' and is therefore moot. (*California Water, supra,* 253 Cal.App.2d at pp. 22-23, fn. 9; see *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 132.)

Thus, ' "[m]ootness has been described as ' "the doctrine of standing set in a time frame:  The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." ' [Citations.]" '

(*Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1008, quoting *Arizonans for Official English v. Arizona* (1997) 520 U.S. 43, 68, fn. 22.) When events render a case moot, the court, whether trial or appellate, should generally dismiss it. (See *Lillbask ex rel. Mauclaire v. Connecticut Dept. of Education* (2d Cir.2005) 397 F.3d 77, 84; see also *Consumer Cause, Inc. v. Johnson & Johnson, supra,* 132 Cal.App.4th at p. 1183 [trial court should have refused to decide case upon plaintiff's discovery that allegations of complaint were wrong and defendant was not violating statute at issue].)" (*Wilson*, *supra,* 191 Cal.App.4th at pp. 1573-1574.)

## C.    The Trial Court Properly Sustained the Demurrer Without Leave to Amend on the Grounds that the Petition Asserted Claims that were Both Moot and Unripe

The City contends YuGAG's claims regarding the validity of the 2011 Agreements were moot at the time the trial court decided them. It asserts that the execution of the Termination Agreement foreclosed YuGAG's CEQA challenges to the 2011 Agreements. The City further claims that YuGAG's complaints about the pending CEQA process and its demand to re-open the RFP process are not ripe. We agree.

### 1.    The Termination Agreement Mooted YuGAG's CEQA Challenges

As discussed, a case is moot when a court's decision "can have no practical impact or provide the parties effectual relief." (*Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888.) Mootness is typically found in cases where, as here, there is a substantive change to the challenged law, order, or agreement after the litigation is filed. (See, e.g., *County Sanitation Dist. No. 2 v. County of Kern* (2005) 127 Cal.App.4th 1544, 1628-1629 [CEQA challenges based on contract no longer in effect are moot]); *Arnold v. California Exposition and State Fair* (2004) 125 Cal.App.4th 498, 503 [new contract that replaced challenged contract rendered issue moot]; *Giles v. Horn, supra,* 100 Cal.App.4th 206 [challenge to county contracts moot where contracts had been fully performed and had expired]; *East Bay Mun. Utility Dist. v. Department of Forestry & Fire Protection* (1996) 43 Cal.App.4th 1113, 1131-1132 [change in challenged policy rendered case moot]; *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698, 704-705 [change to challenged general plan provision rendered issue

9

moot]; see also *Dawson v. Los Altos Hills* (1976) 16 Cal.3d 676, 687 [California courts will not render advisory opinions on the validity of local laws or regulations that have been rescinded], superseded by const. amend. on other grounds as stated in *Not About Water Com. v. Board of Supervisors* (2002) 95 Cal.App.4th 982, 994.)

YuGAG asserts that the issue is not moot because the Termination Agreement "merely reverse[d] the formal approval" of the 2011 Landfill Agreement and the 2011 Facilitation Agreement, and "leaves [the] City's commitment to the Recology proposal in place." YuGAG argues that the Termination Agreement "falls well short of granting" the relief requested in the petition because it not only leaves the Recology proposal in place, it expressly identifies this proposal as the " 'City's preferred alternative.' " Thus, according to YuGAG, "the City carves out, forecloses, any evaluation of alternative disposal sites and remains committed to a definite course of action that cannot pre-date CEQA compliance."

Relying on *Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116 (*Save Tara*), YuGAG argues that the City has committed itself to Recology's proposal "without first understanding the environmental consequences thereof, or comparing such effects with the other landfill disposal proposals before it."

*Save Tara* involved a plan to build new structures on city-owned property that contained a historic house. Before carrying out any environmental review, the West Hollywood City Council approved a " 'Conditional Agreement for Conveyance and Development of Property,' " which provided that the city would convey the land to a developer and lend the developer money to build the structures, provided CEQA requirements were first satisfied, among other conditions. (*Save Tara, supra,* 45 Cal.4th at p. 124.) The Supreme Court held that the agreement constituted an approval of the project because, despite the CEQA-compliance condition, the agreement committed the agency to the project as a practical matter. (*Id.* at pp. 140-141.) The agreement stated that its purpose was to cause the redevelopment of the property. (*Ibid.*) It did not make clear that the city would remain free not to go ahead with the project based on findings in the EIR. (*Ibid.*) Surrounding circumstances demonstrated the city's commitment: It

10

approved another loan to the developer that was not conditional; in support of the developer's application to a federal agency for funding, the city told the agency it would commit up to $1 million in aid; it announced in its newsletter that it " 'will redevelop the property' "; its officials told residents it was obligated to continue on a path toward redevelopment and that certain options for uses favored by opponents, such as a park or library, had been ruled out; and tenants of the historic house were informed that they would be relocated. (*Save Tara, supra,* at pp. 123, 140-142.)

The City's action here has both similarities to and differences to the challenged activities in *Save Tara.* The City's involvement in the Yuba County CEQA review of the Recology proposal, together with its statement that the Recology proposal was the "City's preferred alternative for purposes of CEQA review," revealed its decision to identify the Green Rail Project as the "Project" for purposes of preparing an EIR. However, under *Save Tara*, the critical question is not whether there is merely some level of commitment to a project. Rather, the salient inquiry is "whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project. (See Cal. Code Regs., tit. 14, § 15126.6, subd. (e).)" (*Save Tara, supra,* 45 Cal.4th at p. 139.) In this respect, the challenged 2011 Agreements are different from the conditional development agreements set forth in *Save Tara*, which conditionally committed the City of West Hollywood to take concrete actions toward realizing the development project.

Here, the challenged 2011 Agreements have been terminated and the City has expressly reserved "full discretion" to consider the Green Rail Project in light of the pending CEQA review process, including whether to approve it, whether to adopt possible mitigation measures, and whether to adopt any and all modifications or alternatives to the Project. The Termination Agreement makes clear that there was no binding agreement or commitment to any particular course of action. The Termination Agreement itself recognized that the decision to approve the Project was still very much

11

up in the air. Thus, although the Termination Agreement refers to the Green Rail Project as the City's "preferred alternative for purposes of CEQA review," this commitment to review the Project is unlike the commitment in *Save Tara*, where the City of West Hollywood contractually bound itself to sell land for private development conditioned upon subsequent CEQA review.

Equally unavailing is YuGAG's citation to cases in which courts have considered a CEQA challenge on the merits after determining that effective relief may be granted despite partial or complete construction of the challenged project. For example, in *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, (*Woodward Park*), a project to build two car washes was approved despite a claim by a homeowners' association that because of noise issues an EIR was required before the City of Fresno could approve the project. (*Id.* at pp. 881-883.) The trial court agreed and ordered the preparation of an EIR. (*Id.* at p. 882.) Despite the pending lawsuit and the trial court's order, the developer continued construction and completed the project without obtaining an EIR. (*Id.* at p. 890.) On appeal, the City of Fresno argued that an EIR was no longer required because the project was completed. (*Id.* at p. 887.) The appellate court held the matter was not moot because "[t]his case does not present a situation where a ruling by this court can have no practical impact or not provide the parties relief." (*Id.* at p. 888.) The court concluded the project could be modified, torn down, or eliminated to restore the property to its original condition. (*Ibid.*)

Similarly, in *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1202-1204 (*Bakersfield*), the appellate court held that partial construction of a commercial development project did not moot the appeal because the project could still be modified, reduced, or mitigated. (See *California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 280, fn. 31 (*California Oak*) [EIR for project necessitating removal of live oak trees not rendered moot by removal of the trees after efforts to stay project were unsuccessful because restoration of the site to its original condition could be compelled, additional mitigation measures could be ordered, or the project could be modified, reconfigured or reduced]; *Association for a*

*Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 641 (*ACE*) [removal of gun range without EIR not moot although project completed because of possibility that initial study under CEQA could result in mitigated negative declaration or EIR with mitigation measures].)

Unlike the *Woodward Park, Bakersfield*, *California Oak*, and *ACE* cases, there is no remaining contractual activity or structure that can be modified based on the results of environmental review. Rather, the instant case is akin to *Hixon v. County of Los Angeles* (1974) 38 Cal.App.3d 370, 378, where the court found part of an appeal moot where a party sought environmental review of the cutting down of trees for a sidewalk project. The trees had already been cut down and replaced by new trees by the time of the appeal. (*Ibid.*) Nothing could be done to bring back the old trees and the remedy of planting the new ones had already been effectuated, so it would have been fruitless to order preparation of an EIR studying that question. (*Ibid.*)

So too here, it would be fruitless to grant YuGAG's petition requesting the City to set aside its approval of two contracts and suspend all related activities regarding the contracts, when the contracts have been terminated and have no legal effect. And as such, it would also be ineffective to grant declaratory relief on the asserted ground that the now null contracts were unlawfully approved in violation of CEQA and the City's Administrative Code. For these reasons, we hold that effectual relief is not possible and, consequently, the claims are moot.

"When events render a case moot, the court, whether trial or appellate, should generally dismiss it." (*Wilson, supra,* 191 Cal.App.4th at p. 1574.) However, the general rule is tempered by the court's discretionary authority to decide moot issues. Three discretionary exceptions to the rules regarding mootness have been recognized in CEQA cases: (1) when the case presents an issue of broad public interest that is likely to recur but evade review; (2) when there may be a recurrence of the controversy between the parties; and (3) when a material question remains for the court's determination. (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136

13

Cal.App.4th 1049, 1069; *Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479-480.)

Here, we decline to exercise our discretion in favor of deciding moot issues. Although YuGAG frames the issue as one involving "broad public interest," the gist of the petition challenges the manner in which the 2011 Agreements were created. We can discern no broad public interest in the validity of contracts that have been terminated and that no longer have any effect.

We are also not persuaded by YuGAG's assertion that there may be a recurrence of the controversy between the parties. YuGAG cannot demonstrate that any of its claims are likely to recur because neither YuGAG nor the City knows what agreements, if any, the City may enter into at the end of the CEQA review process.

Finally, YuGAG contends that the action is not moot because "material questions still remain for the court's consideration." This exception, however, applies only "when the judgment, if left unreversed, would preclude a party from litigating its liability on an issue still in controversy." (*Viejo Bancorp, Inc. v. Wood* (1989) 217 Cal.App.3d 200, 205.) That is not true here. Inasmuch as the trial court did not sustain the City's demurrer on the merits, but on the grounds of mootness and lack of ripeness, the judgment entered in this action will not bar YuGAG in the future from pursuing its rights. (See *Epstein v. Superior Court* (2011) 193 Cal.App.4th 1405, 1410 [holding petition moot where actions challenged by plaintiffs had been " 'terminated' " and, if there was a threat that they would recur in the future, "there is no reason to doubt that [a] new lawsuit will present a forum at least equal to this one for a full airing of the questions raised"]).

For these reasons, YuGAG cannot bring this case within any of the exceptions to the mootness doctrine. Accordingly, the trial court did not abuse its discretion in granting the City's demurrer.

2.      *YuGAG's Remaining Challenges Are not Ripe for Review*

As discussed, a basic prerequisite to judicial review of administrative acts is the existence of a ripe controversy. (*PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1216.) " 'Whether a claim presents an "actual controversy" within the

14

meaning of Code of Civil Procedure section 1060 is a question of law we review de novo.' [Citation.]" (*American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 741.) " 'To determine whether an issue is ripe for review, we evaluate two questions: the fitness of the issue for judicial decision and the hardship that may result from withholding court consideration. [Citation.]' [Citation.]" (*Wilson, supra,* 191 Cal.App.4th at p. 1582.)

"The first prong of the ripeness analysis requires us to determine whether the issue is 'appropriate for immediate judicial resolution.' [Citation.] 'Under the first prong, the courts will decline to adjudicate a dispute if "the abstract posture of [the] proceeding makes it difficult to evaluate . . . the issues" [citation], if the court is asked to speculate on the resolution of hypothetical situations [citation], or if the case presents a "contrived inquiry" [citation].' [Citation.]" (*Wilson, supra,* 191 Cal.App.4th at pp. 1582-1583.) YuGAG's action cannot satisfy this first prong because it required the trial court to speculate on the resolution of an entirely hypothetical situation—the possible outcome of the pending CEQA review.

YuGAG asserts that the City, during the ongoing CEQA process, will not consider alternatives to the Ostrom Road Landfill and, as such, the City should be required to re-open the RFP process. Resolution of these claims would have required the trial court to speculate not only on the content of the pending environmental review, but also on whether the City would seek to reenter the same agreements with Recology. The "abstract posture" of these claims make them "too uncertain to constitute a justiciable controversy. [Citation.]" (*Wilson, supra,* 191 Cal.App.4th at p. 1583.)

This case resembles *Selby Realty Co. v. City of Buenaventura* (1973) 10 Cal.3d 110 (*Selby Realty*). In that case, the city and county adopted a general plan that proposed extending streets across the plaintiff's property. (*Id.* at p. 115.) The plaintiff filed a lawsuit against the county, based on its adoption of the plan. (*Id.* at p. 116.) The California Supreme court held that "the plan is subject to alteration, modification or ultimate abandonment, so that there is no assurance that any public use will eventually be made of plaintiff's property." (*Id.* at p. 120.) In so holding, the court explained that the

plaintiff's claim against the county was unripe because the plan "is by its very nature merely tentative and subject to change. Whether eventually any part of plaintiff's land will be taken for a street depends upon unpredictable future events." (*Id.* at p. 118.)

The same is true here. As noted above, the City has reserved "full discretion to consider the Project in light of the results of the Pending CEQA Process and the City's CEQA review." Moreover, the City has retained "full discretion" to decide whether to approve the Recology proposal, modify it, or adopt some other alternative. Here, as in *Selby Realty*, YuGAG's claims are unripe because they necessarily "depend[] upon unpredictable future events." (*Selby Realty, supra,* 10 Cal. 3d at p. 118.) In this case, the City has yet to take any action with respect to the Recology proposal. If, after the CEQA review process, the City again contracts with Recology, remedies are available. " 'Meanwhile, the court may not speculate on the future intention of a public agency.' [Citation.]" (*Wilson, supra,* 191 Cal.App.4th at p. 1584, fn. omitted.)

It is undisputed that the CEQA review is still pending and the City has not yet elected to proceed with Recology's proposal. If and when the City decides to enter a new agreement with Recology, YuGAG may pursue appropriate legal remedies at that time. (*Selby Realty, supra,* 10 Cal.3d at p. 118.)

### III. DISPOSITION

The judgment is affirmed. The City is entitled to its costs on appeal.

_____
REARDON, J.

We concur:

_____
RUVOLO, P.J.

_____
RIVERA, J.

16