Filed 5/26/23  In re R.H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.H., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent;<br><br>v.<br><br>K.S. et al.,<br><br>    Defendants and Appellants. | E079932<br><br>(Super.Ct.No. J283368)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Janelle B. Price, under appointment by the Court of Appeal, for Defendant and Appellant S.H. (father).

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant K.S. (mother).

1

Tom Bunton, County Counsel and David Guardado, Deputy County Counsel for Plaintiff and Respondent.

Both parents, father S.H. and mother K.S., appeal from a judgment declaring their son R.H. a dependent child pursuant to Welfare and Institutions Code, section 300, subdivision (b)(1)[1], for untreated drug abuse, domestic violence and concealing the child's whereabouts, removing him from the physical custody of his parents, and bypassing reunification pursuant to section 361.5, subdivisions (b)(10), (11) and (15). The child came to the attention of the San Bernardino County Children and Family Services (CFS or Department) when his younger sibling was born with methamphetamine in her system, and she was taken into protective custody in the hospital. A detention hearing took place, resulting in a temporary order removing R.H. and placing him in the temporary custody of CFS. The parents concealed R.H.'s whereabouts from CFS for two years, by which time the younger child had been freed for adoption. The petition related to R.H. was reactivated, true findings were made on the allegations of the petition, and R.H. was removed from custody of the parents. The court denied reunification services to the parents, and they appeal.

On appeal, both parents challenge (1) the sufficiency of the evidence to support the jurisdictional findings, (2) the removal of the child from parental custody, (3) the

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

denial of reunification services, and (4) whether CFS conducted an adequate inquiry under the Indian Child Welfare Act (ICWA).[2]

## BACKGROUND

Father and mother have two children between them, a baby girl born in 2019, and a son, R.H., born in 2016. The baby girl was born prematurely with methamphetamine in her system, and mother tested positive for the drug at the time of giving birth. Mother left the hospital against medical advice and the parents left the infant in the hospital for two days, resulting in the intervention by CFS before the infant was discharged. The petition also included allegations of risk to R.H. based on the parents' drug use, the father's criminal history, and the fact mother's whereabouts and willingness to parent were unknown because attempts to locate her were unsuccessful and she left no provision for the child.

At the detention hearing held on December 4, 2019, mother was present and indicated the minor R.H. was with father who did not appear. The court ordered that R.H. be detained and placed in temporary custody of CFS, and signed the detention warrant. The court asked mother about Indian ancestry, and mother denied any Native American heritage, executing the ICWA-020 form. The newborn was ordered detained in the hospital. Father was at the hospital when he was served with the warrant, and reacted by throwing the paperwork at the social worker's feet and yelling obscenities at her.

---

[2] Mother does not independently raise an argument relating to the duty of inquiry under section 224.2, but she joined father's opening brief, where the issue was briefed.

3

When the social worker attempted to investigate the allegations, mother informed the worker that she was living in a motel in Redlands while the baby A.H. was hospitalized, but there was no record of her being registered at that motel or another motel with a similar name. When the social worker located father, he refused to allow her entrance, refused initially to provide identifying information (though he later complied), and while he informed her that he had adequate provisions for the baby and for R.H., he refused to permit the social worker to see them. When the social worker suggested he take a photo of the provisions with his cell phone, he made a feeble excuse, so the social worker suggested he use his mother's phone, but he refused to ask her because his mother did not like CFS. He continuously denied using any drugs or alcohol, despite having a criminal record involving drug offenses, and despite losing custody of an older child due to his drug use.

The detention report also reflects that when the social worker served father with a copy of the detention warrant, he became angry, yelling at the social worker and throwing the paperwork on the floor. On November 27, 2019, the infant A.H. was detained in the hospital pending her discharge. When the social worker, along with a peace officer, attempted to locate R.H. at father's home, the paternal grandmother informed them father was not present and R.H.'s whereabouts were unknown. The report also indicated the social worker performed a risk assessment as a pre-placement preventive service. To this end, the social worker had consulted with a supervising social service practitioner, along with another social worker who had been involved in the case, in which consultation it

4

was concluded that R.H. was at significant risk of neglect and abuse due to the parents' substance abuse issues, their lack of cooperation with the Department and their evasive conduct, but that exigent circumstances were not present so a warrant would be required. The report also listed the suggested services and referrals which could prevent further detention or facilitate return of the children

At the detention hearing of December 4, 2019, mother appeared, but father did not. R.H. was temporarily removed from the parents' custody and placed in the temporary care of CFS. The court signed the detention warrant in open court after making findings of substantial danger to R.H.'s physical and emotional health and that reasonable efforts had been made to prevent detention. The court also ordered CFS to provide services to the family pending development of the case plan and ordered visitation.

After the detention hearing and the service of the protective custody warrant on father, the social worker was unable to locate father to interview him for the jurisdictional report and hearing. A jurisdiction/disposition report was filed on December 26, 2019, in which a statement mother made to the social worker included an admission she used methamphetamines recreationally, and indicated she used weekly while she was pregnant with A.H. On December 13, 2019, father contacted the social worker in an agitated state and told her that R.H. was in his care and that he would not allow R.H. to be taken into custody. However, father refused to cooperate in order to initiate pre-dispositional services.

The jurisdiction report also indicated that father contacted the social worker to locate the placement of the baby, A.H., and informed the social worker that R.H. was with him, but that father would not disclose the location. When the social worker suggested he cooperate so that reunification services could be initiated, father again expressed his refusal to cooperate and hung up on the call. A few days later the social worker called father to complete the interview, and again encouraged father to cooperate with the Department, but father yelled at the social worker about the cruelty of separating families and hung up again.

On December 17, 2019, a concurrent planning assessment of the infant A.H. indicated she was adoptable and that an adoptive home would need to be recruited. The assessment cited as reasons the fact the child was born with methamphetamine in her system, and the parents were not visiting her. On January 2, 2020, the date originally set for the jurisdiction hearing, neither parent appeared. The court ordered R.H. detained upon his whereabouts becoming known and continued the jurisdiction hearing as to him. It also declared the sibling, A.H., to be a dependent child upon a true finding on all allegations of the petition except for the allegation under section 300, subdivision (g), removed custody of A.H. from parents' custody, found that ICWA did not apply, and ordered family reunification services (FRS) respecting that child.

On March 2, 2020, father appeared at the further jurisdiction hearing, but mother did not appear, and the child was reportedly with mother at the time. Father denied the allegations of the petition at that time and informed the court he would not produce the

6

child because it would be too traumatic for the child. When asked by the court, father indicated he had no Indian ancestry, and he executed an ICWA-020 form to that effect. Father also provided a residence address to the court and agreed to submit to a drug test. However, father never reported to the testing site for a drug test, and the parents were still actively hiding R.H., as a consequence of which, the court held an order to show cause hearing where county counsel indicated CFS had filed the missing person's report and now planned to refer the case to the district attorney's office.

At this point, the parents began playing a sort of shell game with CFS, where the father would tell the social worker the child was with the mother, or had moved out of state, and the mother likewise misled CFS as to the whereabouts of R.H.; relatives were similarly unhelpful in locating either the parents or R.H. CFS filed a missing person's report and followed up with the Child Abduction Unit of the Office of the San Bernardino County District Attorney. On January 2, 2020, mother appeared at the continued hearing where jurisdiction was declared over the infant sibling of R.H., she was removed from parental custody, and family reunification services were ordered for the parents. Father did not appear at the hearing and the court and parties assumed that R.H. was with father.

Father appeared in court on March 2, 2020, and denied the allegations of the petition, informing the court that R.H. was with mother in Palm Springs. However, father indicated R.H. lived with him at an address in Yucaipa. Father denied Indian ancestry and agreed to submit to drug testing that day. As to R.H., the jurisdiction

7

hearing had to be continued again, and father was informed that a detention order had already been issued and urged him to cooperate with CFS. Additionally, the court ordered father to submit to drug testing and informed him the matter was being set for an order to show cause to determine if father had complied with the court's orders.

On March 16, 2020, neither parent appeared and the court, upon reviewing the social worker's additional information report, concluded the parents were still hiding the child. The additional information included the social worker's ongoing attempts to contact the parents regarding the child's whereabouts, including contact with the paternal grandmother, which proved fruitless and evasive, and noted father's failure to submit to drug testing as ordered at the prior hearing.

Although the protective custody warrant was issued on behalf of R.H., he was not located until July 8, 2022, when father was arrested while evading arrest for stealing a car and vandalism. The vandalism involved father spray painting on the wall of the men's restroom at a public park a veiled threat: "7-2-2020 mass shooting CPS building and Courts Child Trafficking Release the Kids." Mother and R.H. were with father at the park when he went into the men's restroom, but mother was not aware what he did there.

Mother finally contacted CFS on July 10, 2022, to inform the social worker that she had lived in Beaumont with the child since April 2020, but she did not inform CFS because father had told her about his experience in foster care. Mother also indicated she used drugs because of father and that she was afraid of him due to the threats. Mother admitted that neither she nor father participated in services for reunification with A.H.

8

because they were more focused on keeping R.H. away from CFS supervision. As a consequence, reunification services were terminated in A.H.'s dependency, and parental rights were terminated at the section 366.26 hearing on February 2, 2022. Mother was also currently facing charges of child stealing.

An updated jurisdiction/disposition report was submitted on July 25, 2022, in which details of father's arrest were outlined and R.H. was physically taken into departmental custody. The social worker was contacted by father and was interviewed for the upcoming hearing; father indicated the child was taken care of while with mother and father during the period of their concealment, attending school and church weekly, and asked if the charges could be dropped and that R.H. be returned to the parents' care.

Although mother gave the impression she was no longer with father, jail records of phone calls between the parents, in which they discussed leaving and going out of state with R.H., and the fact mother was seven months pregnant, indicated they were still in a relationship. The social worker recommended that services be denied.

An amended petition was filed on July 27, 2022, adding allegations regarding domestic violence, along with allegations that each parent had absconded with the child, to the prior allegations in the section 300, subdivision (b) count. The social worker recommended no family reunification services. On July 28, 2022, the court set a date for the continued jurisdiction hearing, and the parents appeared in court to deny the allegations of the amended petition. At this appearance, father indicated there may be Indian heritage and submitted his ICWA-020 form.

On August 22, 2022, mother requested a bonding study, which the court granted. The bonding study was completed and the results, which showed a strong parental bond between R.H. and mother, was included with an additional information to the court report on September 28, 2022. Visits between mother and child were observed to go well. The bonding study concluded that severing the bond between R.H. and mother would be detrimental to him.

On September 22, 2022, the jurisdictional hearing took place, where father testified in his own behalf, minimizing his drug use, indicating he had not used drugs since 2019, had never used drugs with mother, and that he completed an outpatient drug program, but did not get his certificate of completion because his Medi-Cal had lapsed. He also asserted that R.H. had lived with him for his entire life.[3] Although he denied domestic violence, he did admit sending text messages referring to fatal consequences if mother surrendered R.H. to CFS, but stated it was just a figure of speech. He also admitted he was convicted of a misdemeanor arising from the charges of child abduction. He indicated he had taken a parenting education course online but had not availed himself of either substance abuse or domestic violence services because he had no problem with those issues. Father also acknowledged that while he was incarcerated, he and mother had discussed leaving the state with R.H. to prevent CFS from intervening.

---

[3] This information is in contrast to information previously provided to CFS and the court that the parents had their own residences. He also testified that he had gone to Alaska for work on August 14, 2022, and that mother had moved out but that he still lived in the apartment where they lived together prior to going to Alaska. So despite mother's statements to the social worker about not cohabiting with the father, it is probable they were still together at the very least until August 2022.

After father testified, there was no additional testimony. The trial court made true findings on all allegations except for the allegations pertaining to mother's whereabouts being unknown, and the allegations made pursuant to section 300, subdivision (g), all of which were dismissed. The remaining allegations were found true.

The court conducted the disposition hearing on October 4, 2022. Additional evidence was presented at that hearing, including testimony by the psychologist who conducted a study of the bond between mother and R.H. After hearing the testimony, the court declared R.H. a dependent child, and removed custody from the parents. The court found father was a presumed father and that R.H. may come under ICWA. The court also made findings pursuant to section 361, subdivision (c) by clear and convincing evidence, as well as findings pursuant to section 361.5, subdivision (b), subparagraphs (10), (11), and (15). The court authorized placement of R.H. in a concurrent planning home placement, denied reunification services and found it would be in the minor's best interests to consider termination of parental rights.

Both parents appealed.

## DISCUSSION

Both parents challenge the juvenile court's findings and orders sustaining the petition, removing custody of R.H. from their custody, and bypassing services. Their respective claims will be addressed together. Separately, father argues that the duties of inquiry into Indian ancestry were not properly discharged, which will be addressed in turn.

11

1. *Disentitlement*

The Department argues the parents' respective appeals should be dismissed pursuant to the disentitlement doctrine. Mother appeared in the juvenile court on December 4, 2019, denied the petition and thereby submitted to the court's jurisdiction. When informed that mother had not brought the child with her, the court signed a detention warrant and found substantial danger to R.H.'s physical and emotional health, as well as finding there were no reasonable means to protect him without removal from the parents. Father appeared in juvenile court on March 2, 2020 and submitted to the court's jurisdiction when he denied the allegations of the petition. The court ordered him to surrender R.H. to CFS and to cooperate with the Department. Father refused to produce the child for evaluation by CFS despite the previous issuance of a detention order and a protective custody warrant. Father and mother concealed R.H.'s whereabouts from CFS, persistently misrepresented their residential situation, and affirmatively refused to cooperate with CFS.

After frustrating CFS's efforts in R.H.'s behalf for two years and violating the court's orders relating to temporary custody of R.H., both parents seek relief from the juvenile court's judgment declaring R.H. a dependent child, removing him from their custody, and denying reunification services. The Department makes a compelling case for dismissal, but we must disagree.

As a general rule, "'[a] party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of

12

contempt to legal orders and processes of the courts of this state.'" (*In re Kamelia S.* (2000) 82 Cal.App.4th 1224, 1228, citing *MacPherson v. MacPherson* (1939) 13 Cal.2d 271, 277.) The disentitlement doctrine refers to a reviewing court's "inherent power to dismiss an appeal by a party who has refused to comply with the orders of the trial court." (*People v. Puluc-Sique* (2010) 182 Cal.App.4th 894, 897.) It "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction." (*Ibid.*)

In the dependency context, given the enormity of the interest at stake for a parent, courts have rarely applied the disentitlement doctrine to dismiss a parent's appeal. Specifically, it is not applied where all the parent's conduct occurred before the juvenile court has taken jurisdiction. (*In re E.E.* (2020) 49 Cal.App.5th 195, 208.) Thus, before the court has established jurisdiction, the court can issue orders detaining a child and orders directing the Department to provide services, but it cannot order or compel a parent to cooperate with the Department. (*Id.,* at p. 209.)

Here, the juvenile court had not yet taken jurisdiction of R.H. when the parents absconded with him despite the detention orders and protective custody warrants issued during their concealment of the child. For this reason, we are unwilling to dismiss the appeals, because other consequences were available for the court to impose, for instance, the denial of services. (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1236-1237.)

2. *Substantial Evidence Supports the Jurisdictional Findings Under Section 300, subdivision (b).*

Both parents argue that there was insufficient evidence to support the trial court's finding that R.H. was a person described by section 300, subdivision (b) because there was no showing of substantial risk of harm at the time of the hearing. We disagree.

a. *Standard of Review*

We begin with the applicable standard of review: "In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings and related dispositional orders, we 'consider the entire record to determine whether substantial evidence supports the juvenile court's findings.'" (*In re G.Z.* (2022) 85 Cal.App.5th 857, 876, quoting *In re T.V.* (2013) 217 Cal.App.4th 126, 133; see also, *In re I.J.* (2013) 56 Cal.4th 766, 773.) Evidence is substantial if it is reasonable, credible and of solid value. (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140.) We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*In re I.J., supra,* at p. 773; *In re H.G.* (2006) 146 Cal.App.4th 1, 13, citing *In re S.C.* (2006) 138 Cal.App.4th 396, 415.) The burden is on the party or parties challenging the findings and orders of the trial court to show there is no evidence of a substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

*b. Legal Principles Pertaining to Jurisdiction Under Section 300,*

*subdivision (b)(1)*

It is now well settled that dependency jurisdiction may be asserted under subdivision (b) of section 300 if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] . . . [t]he failure or inability of the child's parent . . . to adequately supervise or protect the child" or the "inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse." (§ 300, subds. (b)(1)(A) & (D).) "'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re L.B.* (2023) 88 Cal.App.5th 402, 410-411, quoting *In re R.V.* (2012) 208 Cal.App.4th 837, 843; see also, *In re Heather A.* (1996) 52 Cal.App.4th 183, 194-196; *In re Michael S.* (1981) 127 Cal.App.3d 348, 357-358.) "The focus of section 300 is on averting harm to the child." (*In re T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

It is also well accepted that "[w]hen a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence. (*Randi R. v.*

15

*Superior Court* (1998) 64 Cal.App.4th 67, 72; *In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875-876.)

Section 300, subdivision (b) provides that a child is a person described by section 300 if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's . . . substance abuse." "The finding of dependency cannot be based on substance abuse alone; jurisdiction requires a substantial risk of harm to the child arising from the substance abuse." (*In re J.A.* (2020) 47 Cal.App.5th 1036, 1046, citing *In re Alexis E.* (2009) 171 Cal.App.4th 438, 453.)

Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824), "[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*In re N.M.* (2011) 197 Cal.App.4th 159, 165). "'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.'" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022, quoting *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.)

Importantly, in making its jurisdictional findings, the court may consider past events, including a parent's past conduct, if there is reason to believe that the past circumstances will continue in the future. (*In re S.O.* (2002) 103 Cal.App.4th 453, 461;

16

*In re T.V., supra*, 217 Cal.App.4th at p. 133.) "A parent's past conduct is a good predictor of future behavior." (*T.V.*, *supra*, at p. 133.)

It has been held that a finding of substance abuse must be based on evidence sufficient to show that: (1) the parent had been diagnosed as a having a current substance abuse problem by a medical professional; or (2) the parent has a current substance abuse problem as defined by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) (DSM-IV).[4] (*In re Drake M.* (2012) 211 Cal.App.4th 754, 766 [disapproved on a different point in *In re D.P.* (2023) 14 Cal.5th 266, 283].)

However, several cases have disagreed with *Drake M.* (See *In re K.B.* (2021) 59 Cal.App.5th 593, 601; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1218 [holding the *Drake M.* formulation "is not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court, and we are unwilling to accept [the]

---

[4] "The full definition of 'substance abuse' found in the DSM-IV-TR describes the condition as '[a] maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12-month period: [¶] (1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household)[; ¶] (2) recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired by substance use)[; ¶] (3) recurrent substance-related legal problems (e.g., arrests for substance-related disorderly conduct)[; and ¶] (4) continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights).' (DSM-IV-TR, p. 199.)" (*In re Drake M., supra,* 211 Cal.App.4th at p. 766.) Note that in the newer edition of the DSM, reference is no longer made to "substance abuse" (Diagnostic and Statistical Manual (DSM) (2013) 5th ed., p. 481, see fn. 4).

argument that only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM-IV-TR categories can be found to be a current substance abuser."]; *In re Rebecca C.* (2014) 228 720, 725.)

In *In re Christopher R., supra,* the court rejected an argument that only someone who has been diagnosed by a medical professional or who falls within one of the specific DSM categories can be found to be a current substance abuser. (*In re Christopher R., supra*, 225 Cal.App.4th at p. 1218.) In that case, the court referred to the DSM-IV, but recognized it had been superseded by the fifth version of the DSM, which had a much broader definition for substance "use" disorders. (*In re Christopher R., supra,* at p. 1218, fn. 6.) In fact, the current DSM-V, which was adopted in 2013, before the dependency in the instant case, as well as the DSM-V-TR now refer to "Substance Use Disorders" and "Substance-Induced Disorders" rather than "substance abuse." (DSM, *supra*, 5th ed., p. 481 (2013); the DSM-5TR (text revision) was published in 2018.) But this question is purely academic when applied to a case in which neither parent cooperated with CFS in investigating the allegations of the petition. Parties should not be permitted to rely on the paucity of information available to the Department caused by their own conduct in withholding information and refusing to cooperate by submitting to drug testing when ordered by the court or requested by CFS.

In *Christopher R.,* the mother conceded jurisdiction was proper as to her youngest child, who was born with a positive toxicology screen for cocaine and other illicit drugs, but argued that "the evidence of her sporadic drug use was insufficient to support the

findings she was a current substance abuser and [that her other three children] were at substantial risk of serious physical harm justifying the exercise of the juvenile court's jurisdiction." (*In re Christopher R., supra,* 225 Cal.App.4th at p. 1215.) But the court rejected mother's attempt to minimize her drug use by describing it as "sporadic," and initially admitting to only marijuana use (later revealing additional controlled substance use) in order to persuade the court there was no substantial risk to the children. (*Id.,* at p. 1217.)

The court in *Christopher R.* concluded that mother's denials following the positive toxicology screen for the infant at birth, which unquestionably endangered the health and safety of her unborn child, were properly disbelieved by the juvenile court where her claims of sporadic drug use, taken together with her unstable lifestyle and cavalier attitude toward childcare, fully supported the juvenile court's jurisdictional finding. (*In re Christopher R., supra,* 225 Cal.App.4th at p. 1217.)

A similar approach was used in a more recent case where, "given mother's implausible denial of the extent of her drug use while pregnant, her evasive behavior, and her resistance to monitoring and services, the juvenile court could reasonably disbelieve her offer of proof that she was no longer using. We conclude the record contains substantial evidence to support a finding that, at the time of the hearing, E.'s siblings were at risk of suffering serious harm as the result of neglect on mother's part." (*In re E.E., supra,* 49 Cal.App.5th at pp. 214-215.)

The parents in the present case share similarities with the mothers in *Christopher R.* and *E.E.*, insofar as both parents denied the extent of their respective drug use, refused to cooperate with CFS in the investigation of the allegations of that drug use, were evasive, and resisted monitoring and services. Under these circumstances, the juvenile court reasonably disbelieved their statements attempting to minimize their use of controlled substances.

As suggested in the discussion of the disentitlement doctrine, the consequences to the parents for their lack of cooperation is that they are estopped to deny the existence of a drug abuse problem where their conduct prevented the Department from adequately assessing it.

At this point, we feel compelled to point out that father's testimony at the jurisdiction hearing did not help his case, and his arguments on appeal ignore the contrary evidence that supports the judgment. Suffice it to say his testimony that his drug of choice was marijuana and that he had not used since 2019 was contradicted by mother's statements to the social worker and his criminal history of convictions for use and possession of drugs that were not marijuana. In short, his assertions that he lacked a drug abuse problem, but, if he did, he had undergone treatment for which he did not receive a certificate of completion,[5] were simply not credible.

---

[5] According to the detention report prepared in December 2019, the mother of that child was awarded full custody because father failed to complete a drug program.

Additionally, it is irrelevant that father "fear[ed] what the state might do to his family" as that is no excuse for his refusal to surrender R.H. after being served with the warrant to detain the child. Particularly after the juvenile court ordered R.H. detained in 2019, the parents' justification for concealing the child's whereabouts was unjustified. Indeed, the court ordered R.H. detained with the department at every hearing beginning in 2019, such that the parents' retention of R.H. violated a temporary custody order.[6] Considering the totality of the evidence, including father's refusal to cooperate with CFS, comply with the detention warrant, or permit access to R.H. to evaluate his well-being, the juvenile court properly found true the substance abuse allegation against father.

Mother's position on the jurisdictional findings is similarly problematic: she tested positive at the time of A.H.'s birth and a few days afterwards, when she returned to the hospital after leaving it against medical advice and tested positive for methamphetamine; she did not have prenatal care for A.H.; she denied having a drug problem, but admitted she used amphetamines recreationally, and used at least one time per week while pregnant, in an early interview with the social worker. Her absence for two years naturally complicated the assessment of her problems, and her failure to cooperate with CFS estops her to deny having a drug problem. Preventing a thorough assessment, however, does not eliminate a drug problem or the Department's duty to investigate. Her poor judgment in regularly using drugs while pregnant and while then

_____

[6] We recognize that until jurisdiction is established, a juvenile court cannot award custody to a nonparent (see, *In re E.E., supra*), but the court was authorized to make findings that parental conduct posed a substantial risk of harm to the child sufficient to warrant a temporary detention. (§ 319.)

21

three-year-old R.H. was in her care, along with her decision to elude CFS by going off the grid with father instead of complying with the protective custody warrant, reflect poorly on her argument there was no current substantial risk of harm.

Further, while she attempted to shift responsibility to father for her drug use and denied she lived with father or knew his address, her circumstances at the time of the hearing showed she was still involved in a relationship with father, whose use of drugs mother blamed for her own use. Given her willingness to remain in a relationship with him up to the date of the hearing, her lack of judgment exposed R.H. to a substantial risk of harm, that persisted to the time of the hearing. The assertions that she provided good care for the child while she participated in concealing the child's whereabouts carry no weight whatsoever where her conduct prevented CFS from carrying out its duty to investigate the welfare of the child. In addition, the argument that mother may have used but not abused controlled substances is entitled to no weight given mother's refusal to cooperate with CFS in investigating the extent of her drug use.

Jurisdiction based on the parents' substance abuse was proper considering the parents' conduct in evading CFS as well as the conduct that gave rise to the initial intervention by CFS in deciding whether R.H. presently needs the court's protection. (*In re Christopher R., supra*, 225 Cal.App.4th at pp. 1215-1216.) In addition, the parents' extreme lack of judgment and insight into the manner in which their conduct placed R.H. at risk demonstrated the risk was present at the time of the hearing and increased the potential for future risk. (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 996; *In re Gabriel*

22

*K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge."]; see also, *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision."].)

The parents' past acts, considered along with their refusal to cooperate with the Department's investigation of the allegations demonstrate that R.H. is at substantial risk of serious physical or emotional harm due to mother's substance abuse, reflecting a current and substantial risk of serious harm, that existed at the time of the hearing and would continue in the future.

The parents have not challenged the other bases for jurisdiction that were found true by the court. Thus, even if we could not find substantial evidence to support the findings as to their alleged drug use, we would affirm.

3. *The Order Removing Custody from Parents Is Supported by Clear and Convincing Evidence.*

Both parents argue there was insufficient evidence to support the judgment removing R.H. from their custody. We disagree.

a. *Evidence Presented at the Disposition Hearing*

At the disposition hearing, the trial court heard testimony from a bonding expert respecting the close bond between R.H. and his mother. That evidence included the expert's testimony that mother's scores on the Substance Abuse Subtle Screening Inventory (SASSI) were concerning due to the high defensiveness shown in the results,

23

which, despite a low score on the probability of substance abuse, demonstrated mother may have been minimizing her responses. However, mother's responses on the Minnesota Multiphasic Personality Inventory (MMPI) test indicated substance abuse. However, the expert was unaware whether mother had been testing for CFS and, if she had, what those results might have been. The expert was unaware mother had missed three drug tests, or that she had been using drugs for two years while R.H. was in her care.

Additionally, the expert testified that in her original interview with mother, mother lacked understanding that she was in a domestically violent relationship, but in the second interview it appeared she was beginning to understand that. The expert opined mother was the victim of domestic violence based on the information in the reports relative to father's threats and his behavior controlling her. Mother denied father had anger issues, which the expert indicated was attempting to justify remaining in the relationship previously. The expert was concerned to find out that mother had told the expert she was no longer in a relationship with father, where father had testified at the jurisdiction hearing that he was still in contact with her. It also concerned the expert that mother had not obtained a restraining order against father. Additionally, the expert was unaware that mother had indicated she was living at a new address on her own, yet, when CFS attempted to confirm the new address, it was discovered she did not live there.

The expert's interview with R.H. revealed he cared about his mother, loved her, and missed her when she was not present. In the expert's opinion, frequent visits with mother would be beneficial. After the expert testified, mother refused to testify

In addition to the bonding study, the court had for its consideration all the social workers' reports filed in the case since its inception in 2019. The court was also able to observe the parents' conduct during the proceedings. During the disposition hearing, father attempted (unsuccessfully) to record the proceedings on his cell phone and had to be admonished. Additionally, the most recent report submitted as additional information to the court, was revelatory about mother's defensiveness regarding her relationship with father and her failure to take certain actions or follow up becoming involved with services in a timely fashion.

The additional information report included the information contradicting mother's statement that she had an apartment of her own and indicated instead that CFS learned she was still living with father. Father had not engaged in any services whatsoever and had refused to meet with social workers throughout the dependency proceedings, commencing in 2019, with the exception of telephone contact made to the social worker while father was incarcerated.

Regarding mother, in the July 25, 2022 jurisdiction report, mother acknowledged using drugs with father, but stated she had not used drugs since 2019. As a consequence, she was disqualified from participation in the MFI substance abuse program, although she did test negative for drugs there. However, in the October 4, 2022 addendum, mother

25

indicated she had enrolled in MFI and that she could submit to drug testing there to make up for other tests she had missed due to conflicts with her schedule of doctor appointments.

Out of four drug tests ordered since the parents had resurfaced, mother had submitted a sample only once, failing to appear at the testing site three times, aware that a missed test was considered a positive test for drugs. Mother was subsequently asked to test while in the CFS office, on the same day as her color was called, but she told the social worker she was unable to test due to the lack of a female attendant. However, the lab report simply reflects one negative test and four no-shows. Mother had enrolled in counseling, but her attendance was described as "hit and miss," attending only three sessions out of six. Further, she had not participated in domestic violence services, despite informing the social worker father had threatened to kill her, making her afraid of him, and informing the bonding expert that she was a victim of domestic violence. She admitted neither she nor father participated in any services for A.H. because they did not want R.H. involved.

At the close of evidence at the disposition hearing, the juvenile court made findings, by clear and convincing evidence, that there was a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's physical custody.

26

*b. Analysis*

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 169.) Pursuant to section 361, subdivision (c)(1), the juvenile court may remove a child from the custody of a parent if it finds, by clear and convincing evidence, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

We review whether there was substantial evidence to support the court's removal order under the heightened standard of review set by our Supreme Court. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) When "presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the [appellate] court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Ibid.*) "All evidentiary conflicts are resolved in favor of the respondent, and where more than one inference can reasonably be deduced from the facts, we cannot substitute our own deductions for those of the trier of fact." (*In re G.C.* (2020) 48 Cal.App.5th 257, 265, citing *In re John V.* (1992) 5 Cal.App.4th 1201, 1212.)

27

A court considering the disposition of a dependency child may consider not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention. (*In re I.R.* (2021) 61 Cal.App.5th 510, 520, citing *In re Alexzander C.* (2017) 18 Cal.App.5th 438, 451–452 [overruled on a different point in *Conservatorship of O.B., supra*, 9 Cal. 5th at p.1010]; *In re N.M., supra,* 197 Cal.App.4th at p. 170.)

Even under the clarified reviewing standard applicable to review of orders for which findings by clear and convincing evidence applies, a court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child, as we have previously noted. (*In re L.B., supra,* 88 Cal.App.5th at pp. 410-411.) Instead, the juvenile court must determine whether there is *or would be* a substantial danger to the physical health, safety, or physical or emotional well-being of the minor if the minor were returned home and there are no reasonable means by which the minor's physical health can be protected without removing the child. (§ 361, subd. (c)(1), italics added.)

Here, both parents rely solely on policy statements favoring preservation of families, and their statements that the child was well cared for while concealed, to support their argument that the juvenile court erred in removing R.H. from their custody. They ignore their own conduct that gave rise to the Department's intervention and the continuing risk posed by their evasive tactics. However, Evidence Code section 664 provides, "It is presumed that official duty has been regularly performed[,]" and the

28

presumption is conclusive in the absence of evidence that the official duty was not performed. (*In re Angelina E.* (2015) 233 Cal.App.4th 583, 588.)

We turn our focus to the sufficiency of the reasons for which the trial court removed R.H. from his parents' custody. The court listed the litany of examples of the parents' actions that gave rise to the court's conclusion that return of R.H. to the parents' custody was not in R.H.'s best interests, the first level of inquiry required at a disposition hearing. The court referred to the mother's "defensiveness" as a type of "deceptiveness." The court also adopted the findings recommended in the addendum report filed on the date of the hearing. Those recommendations were grounded on the parents' failure to adequately engage in services. For example, while the mother had stated she had not been able to contact the domestic violence counselor, there was contradictory evidence that both the counselor and the parent partner had made multiple attempts to contact mother unsuccessfully. Instead, mother enrolled in an online program that will only take emails or text messages to verify enrollment.

Regarding individual counseling, mother claimed she was unable to make scheduled sessions due to doctor's appointments, but she never called the therapist to cancel or reschedule sessions. Regarding parenting education, mother was scheduled to attend a program but she failed to do so, instead enrolling in an online course that could not be verified by the Department. While mother's counsel at the hearing argued that she had made an effort, her history of deception undermined that argument.

29

The mother's use of drugs at the time of A.H.'s birth, while she was caring for R.H., accompanied by the domestic violence allegations flowing from father's threats and controlling behavior, as well as mother's willing participation in the concealment of R.H. from CFS for two years, during which period mother abandoned A.H. by refusing to participate in services or cooperate with CFS, amply demonstrate a substantial risk of harm to R.H. if he were returned to mother's care. Ongoing concerns over mother's drug use and domestic violence, as well as mother's propinquity for misleading both the juvenile court and CFS support the court's findings by clear and convincing evidence.

As to father, the same concerns exist, and are amplified by his ability to control mother. His history of drug use includes multiple criminal convictions. In addition, his continuous involvement in property crimes, which have resulted in two separate incarcerations just since the original dependency petition was filed in this case, reveal he is unable to reliably care or provide for R.H. Further, his angry outburst against the social worker when served with the detention warrant, and his vandalism of the park bathroom reveal a lack of the ability to control his impulsive behavior, which poses ongoing risk of harm to R.H. Finally, his unwillingness to address any of his problematic parenting by engaging in pre-disposition services show an unwillingness to acknowledge the problems that led to removal.

In sum, the parents' conduct relating to the reasons for the original referral, followed by their refusal to cooperate with CFS in investigating R.H.'s welfare, their violation of court orders, their dishonesty relating to their residences and R.H.'s location,

30

concealing his whereabouts for two years, as well as minimalizing the degree of their substance abuse issues and domestic violence, established clear and convincing evidence that removal of R.H. from the parents' custody was necessary.

As to father's incredible assertion that CFS failed to provide pre-disposition services to prevent removal, this assertion is easily dismissed by simply referring to the original 2019 jurisdiction report in which the social worker attempted to offer father whatever services could be provided while he was incarcerated, which evoked an angry outburst, causing the social worker to terminate the interview. The court at the original detention hearing respecting A.H. ordered pre-dispositional services to both parents, but neither parent participated. At the jurisdiction-disposition hearing for A.H. they were granted family reunification services, but father consciously refused to participate, in order to further conceal R.H.'s whereabouts from CFS.

When the parents' resurfaced in 2022, a hearing was held in which the jurisdiction hearing date was set, and pre-disposition services were ordered for mother. However, at that time, father was incarcerated. The social worker met with father while he was incarcerated and explained that CFS would attempt to set up services for him in collaboration with the jail, but father exploded in rage, accused the social worker of stealing his child, became aggressive and began banging his phone on the glass partition. A parent's participation in reunification services is voluntary; the Department cannot force an unwilling parent to participate in such services. (*In re Christina L.* (1992) 3

Cal.App.4th 404, 414.) Father was offered services, but, like the horse being led to water, CFS could not force him to accept the offer.

Father and mother's commitment to parenting is questionable, given they consciously abandoned any effort to reunify with A.H. in order to keep R.H.'s whereabouts secret. Given their strident defiance of CFS's attempts to assess R.H.'s wellbeing for two years, their drug use of which they were both in denial, and their dishonesty in providing information to CFS regarding their place or places of residence, they cannot now complain there was an insufficient showing that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's physical custody.

4. *The Court Properly Denied Reunification Services for the Parents Under Section 361.5, subdivision (b).*

Both parents contend the court wrongly denied them reunification services. We disagree.

Ordinarily, when a child is removed from parental custody, the juvenile court must order services to facilitate the reunification of the family. (§ 361.5, subd. (a).) """"Nevertheless, as evidenced by section 361.5, subdivision (b), the Legislature recognizes that it may be fruitless to provide reunification services under certain circumstances. [Citation.] Once it is determined one of the situations outlined in

subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources.'" [Citation.] An order denying reunification services is reviewed for substantial evidence. [Citation.]'" (*D.F. v. Superior Court* (2015) 242 Cal.App.4th 664, 669, quoting *R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914.)

Section 361.5, subdivision (b), sets forth situations which reflect "'a legislative assumption that offering services would be an unwise use of governmental resources. [Citation.]'" (*In re Ethan N.* (2004) 122 Cal.App.4th 55, 65.) Three bases for bypassing services were asserted in the present case.

### a. *Section 361.5, subdivision (b)(10)*

One situation is described by section 361.5, subdivision (b)(10), and refers to situations in which "the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian." (§ 361.5, subd. (b)(10)(A).)

"'To apply section 361.5, subdivision (b)(10), therefore, the juvenile court must find both that (1) the parent previously failed to reunify with a *sibling* [*or half sibling*]

33

and (2) the parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling [or half sibling].'" (*In re I.A.* (2019) 40 Cal.App.5th 19, 24, quoting *In re Albert T.* (2006) 144 Cal.App.4th 207, 217.)

Denying reunification services in recidivism cases is appropriate if "the parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling." (§ 361.5, subds.(b)(10), (b)(11).) We review an order denying reunification services for substantial evidence. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.)

Clear and convincing evidence in support of this ground for denial of reunification services is easily met, where the record demonstrates the parents consciously decided not to participate in reunification services or even to attend court hearings or cooperate with CFS respecting A.H., in order to prevent the removal of R.H. Services were terminated as to A.H. before the jurisdiction hearing in the present case involving her older sibling. The parents have taken no steps to correct the problems that led to removal of A.H. In fact, mother waited until just before the contested jurisdiction hearing to initiate any involvement with services, although her enrollment in some services were with providers not approved by CFS and her participation in other services was not regular. As to father, a referral for services was made in August 2022, just before the jurisdiction hearing, but as of the date of the last Addendum report, father had not signed the necessary releases to confirm his enrollment.

Both parents acknowledged their failure to participate in services respecting A.H., and that this led to termination of their parental rights as to that child. There is substantial evidence to support the denial of services on this ground.

### b. Section 361.5, subdivision (b)(11)

The second ground the bypass of services was based on is section 361.5, subdivision (b)(11), which provides, "[t]he parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." (§ 361.5, subd. (b)(11)(A).) This statute "recognizes the problem of recidivism by the parent despite reunification efforts." (*In re Baby Boy H*. (1998) 63 Cal.App.4th 470, 478.)

The record in the present case demonstrates that the parents' parental rights were severed as to A.H. after the reunification services that had been ordered in her dependency had been terminated. Further, the record amply demonstrates that neither parent had subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent. To the contrary, both parents denied the existence of any problems with their parenting or their conduct, including their refusal to cooperate with CFS and concealing R.H. from the court and from CFS. There was proof by clear and convincing evidence to support this ground.

### c. Section 361.5, subdivision (b)(15)

The third basis for bypass of services is provided in section 361.5, subdivision (b)(15), which provides: "[t]he parent or guardian has on one or more occasions willfully abducted the child or child's sibling or half sibling from their placement and refused to disclose the child's or child's sibling's or half sibling's whereabouts, refused to return physical custody of the child or child's sibling or half sibling to their placement, or refused to return physical custody of the child or child's sibling or half sibling to the social worker."

"[T]he term 'placement' . . . includes the actions of the juvenile court in placing a child with the parent, guardian, foster parent or licensed group home." (*A.A. v. Superior Court* (2012) 209 Cal.App.4th 237, 244.) "[T]he term 'abduct' refers to a forceful or fraudulent removal of a person, or a child, as in this instance." (*Id.*, at p. 244.)

The problem with this ground is that despite the detention order and issuance of protective custody warrants, R.H. was never in a court ordered placement because jurisdiction had not been established over him. Nor was he abducted given that the parents simply concealed his whereabouts to prevent CFS from locating and taking him into custody. We therefore conclude this ground has not been met.

Nevertheless, reversal is not required. "[O]nly one valid ground is necessary to support a juvenile court's decision to bypass a parent for reunification services." (*In re Madison S.* (2017) 15 Cal.App.5th 308, 324; see also, *Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121.) Here, there are two valid grounds.

36

### d. *Section 361.5, subdivision (c):*

Having concluded that two out of three grounds for bypassing reunification services are well-founded, we must determine whether the provision of services would nonetheless be in the child's best interests.

"The court shall not order reunification for a parent or guardian described in paragraph (3), (4), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), or (17) of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (§ 361.5, subd. (c)(2).)

A juvenile court has broad discretion when determining whether reunification services would be in the best interests of the child. (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1140-1141.) "' Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources. [Citations.]'" (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744; *In re William B.* (2008)163 Cal.App.4th 1220, 1227.) "The burden is on the parent to change that assumption and show that reunification would serve the best interests of the child." (*In re Williams, supra*, at p. 1227.)

To determine whether reunification is in the child's best interest, the court considers the parent's current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity. (*In re William B.*, *supra*, 163 Cal.App.4th at

p 1228.) A best interest finding requires a likelihood reunification services will succeed; in other words, "some 'reasonable basis to conclude' that reunification is possible." (*Id.,* at pp. 1228–1229; *In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116.)

Neither parent can meet this burden. Besides the two bases for bypassing services raising the legislative presumption against providing services, the record reflects father induced or contributed to mother's drug use and even left his methamphetamine with her when they were apart, continued committing criminal acts, he threatened to kill mother if she complied with the detention warrant, and he was openly hostile on several occasions with the social workers.

Although the bonding study showed R.H. loved his parents, father only enrolled in a domestic violence program the day before the disposition hearing, *after* jurisdiction had attached. As for parenting classes, he completed 3.5 hours of parenting classes in August 2022, a month before the jurisdiction hearing.

"Section 361.5, subdivision (b) 'reflects the Legislature's desire to provide services to parents only where those services will facilitate the return of children to parental custody.' [Citations.]" (*In re Allison J., supra*, 190 Cal.App.4th at p. 1112.) In section 361.5, subdivision (b), the Legislature recognized that it may be fruitless to provide reunification services under certain circumstances. (*In re B.H.* (2016) 243 Cal.App.4th 729, 736.) Father's payment of lip-service at the eleventh hour does not persuade us that it is in R.H.'s best interests to offer reunification services because he has not demonstrated that reunification is likely to succeed.

The strength of R.H.'s bond with his mother is a slightly different matter, but we are struck by some huge concerns. She began to engage in services shortly before the jurisdiction hearing.[7] This was a positive step, but she did not fully disclose to the domestic violence program counselor that she was still in a relationship with father, and the information she gave to the bonding expert was not entirely open.

Regarding the likelihood reunification will succeed, mother did not carry her burden.

First, mother appears to still be under father's control and was willing to abandon A.H. in order to prevent CFS from evaluating R.H.'s well-being. Whether this is attributable to a lack of maternal feelings, or due to father's influence that led her to discard any chance of regaining custody of her baby, she is responsible for her own decisions. The casual manner in which she opted to not even try to reunify with A.H. does not speak well of her commitment to parenting.

Second, it is apparent both that she is easily influenced by father and that she was still actively in a relationship with him at the time of the hearing. Mother's priorities have put father's needs and wants above those of her children. Therefore, it is unlikely that providing her with reunification services would be in R.H.'s interests.[8]

_____

[7] Mother notified the social worker of her entering the program on September 22, 2022, but the social worker could not confirm the information because mother had not signed a release.

[8] This does not foreclose the possibility mother could participate in services on her own and then apply for a modification of the order denying services, but it would require her to reassess her priorities.

Finally, mother did not commence any services whatsoever until shortly before the jurisdiction hearing, and then did not fully engage. She was not fully compliant with drug testing, domestic violence counseling or individual counseling. Despite the strong bond between R.H. and mother, it cannot be said that mother demonstrated reunification would be successful.

On this record, the juvenile court did not err in finding that providing services to the parents would not be in R.H.'s best interests.

5. *Because the Court found ICWA May Apply, No Failure to Investigate Has Occurred.*

Father claims (and mother has joined) that CFS failed to discharge its duties of inquiry under ICWA. Because the juvenile court did not make a finding that ICWA does not apply, this argument is not justiciable. Instead, the juvenile court made a finding that ICWA may apply.[9]

"Generally, California courts decide only justiciable issues." (*Davis v. Fresno Unified School Dist.* (2020) 57 Cal.App.5th 911, 926, citing *Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1573 (*Wilson*).) Justiciability means the questions litigated are based on an actual controversy. (*Wilson, supra,* at p. 1573.)

---

[9] Neither parent appealed from any of the findings, orders, or judgment in the case involving the sibling A.H., where the juvenile court found that ICWA did not apply.

40

Unripeness and mootness describe situations where there is no justiciable controversy. (*Wilson, supra,* 191 Cal.App.4th at p. 1573.) Unripe cases are those in which an actual dispute or controversy has yet to come into existence. (*Ibid.*)

Ripeness is one facet of the prudential doctrine of justiciability. (*In re M.F.* (2022) 74 Cal.App.5th 86, 106.) "'A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' [Citation.]" (*Wilson, supra,* 191 Cal.App.4th at p. 1573.)

The ripeness requirement prevents courts from issuing purely advisory opinions. (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170.) It is founded on "'the recognition that judicial decision making is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.' [Citation.]" (*Wilson, supra*, 19 Cal.4th at p. 157.)

Here, the court has yet to close the chapter on the possibility that R.H. is or may be eligible to become an Indian child. That investigation is ongoing. We note that the juvenile court did not immediately set a hearing to select and implement a permanent plan for R.H. pursuant to section 366.26. Of course, the adequacy of the inquiry depends in large part on the cooperation of the parties.

There is no showing of a failure to conduct an inquiry of R.H.'s possible Indian heritage at this stage of the proceedings.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
                                                              P. J.

We concur:

SLOUGH_____
                            J.

FIELDS_____
                            J.